Mr. Justice Cox
delivered the opinion of the court.
In February, 1870, Castleman, the owner in fee of a part of lot 10, in square 489, iti Washington, conveyed it to S. L. Phillips, in trust, to secure a debt of $5,000 due to the Mutual Life Insurance Company.
While Castleman owned the equity of redemption, Holtzman, one of the complainants, recovered a decree against him for about $5,000, and Roach, the other complainant, recovered a judgment against him for about $900, and on both, these writs of fi. fa. were issued, which were returned nulla bona. While the decree and judgment were in full force, but before any proceedings were commenced in equity to enforce them against the equity of redemption, Castleman sold and conveyed his equity of redemption to Van Riswick. Shortly after, this bill was filed by Roach and Holtzman, to subject the equity of redemption in Van Riswick’s hands to *172 sale, for the satisfaction of this judgment and decree, and the court below decreed a sale accordingly ; from which decree Van Riswick appealed.
The decree passed at special term was based upon an act of the legislative assembly of the District of Columbia, of August 2, 1871, entitled, “An act to make judgments a lien on equitable interests.” It enacts, “ that all judgments that have been, or hereafter may be, enterered by the Supreme Court of the District of Columbia against any person or persons *, * * be, and the same are hereby made and declared to be, a lien on equitable interests of such person or persons * * * in and to any real estate within the District of Columbia, from and after the date of this act : Provided, that such lien shall only be euforced by a proceeding in equity,” &c., &c.
On the part of the defendant, Van Riswick, it is contended that the District legislature had no authority, and that it was not competent even for Congress to authorize it to enact a law of this description.
There has been an instinctive reluctance on the part of bench and bar, to recognize the legislation of the late government of the District as valid, so far as it transcended the limits of strictly municipal action. This sentiment has hardly shaped itself into a definite opinion or formulated the reasons for its existence. It has sometimes sought its excuse in the want of positive confirmation by Congress of the legislation in question. This, however, is a very unsatisfactory foundation for it. The organic act, as it is called, i. e., the act of February 21, 1871, which establishes the District government, nowhere contains an intimation that the acts of the new government are to be inoperative until or unless confirmed by Congress; but, on the contrary, by the strongest implication, excludes such idea. The 50th section declares that all acts of the legislative assembly shall at all times be subject to repeal or modification by the Congress of the United States. Until repealed or modified, the clear implication is that they are to operate, proprio vigore. If Congress had first to approve, it is obvious that *173 its judgment as to the rightfulness or expedience of measures submitted to them would be exercised then, and it was unnecessary to reserve it expressly, or the occasion when legislation once in force, is to be reviewed in order to modify or annul if. It is plain to us that as far as Congress could confer the power of original and independent legislation, needing no confirmation, but complete and operative in itself, it has done so by the act- in question. The unwillingness so generally felt to give effect to this legislation grows partly out of a lurking doubt which existed from the beginning and has never been dispelled, as to the constitutional power of Congress to create such an anomalous entity as the late District government, and to invest it with the powers which the act of 1871 purports to convey.
It was maintained in argument, that the true construction of the organic act of 1871 does not require us to believe that Congress intended to confer on the District government any other legislative powers than are appropriate to a municipality, and that general expressions in this direction are to be qualified by the language constituting the District a corporation for municipal purposes.
We cannot doubt, however, that Congress intended to confer on the District government the fullest legislative power with certain express restrictions. Their power is declared to extend to all rightful subjects of legislation consistent with the Constitution and the provisions of the organic act, and subject to the restrictions and limitations imposed upon the States by the 10th section of the first article of the Constitution. These restrictions upon the States are restrictions upon a plenary legislative authority, and have no meaning as applied to a mere municipal body. Besides that, if the exception proves the rule, the express prohibition against the passage of certain classes of special laws which belong to the general legislative authority of a State, is a proof that, but for such prohibitions and subject thereto, such general legislative authority was intended to be conferred. The express powers to create corporations, to regulate the practice of courts, &e., are also such as *174 appertain only to a general legislative authority. And if this authority is rightfully conferred, we shall .have to uphold all the legislation of the late District government, however foreign it may be, to the limited purposes of a municipality; such as their act of August 23, 1871, revolutionizing the whole law of conveyancing in the District, establishing a new rule of limitations for actions of ejectment, and changing the titles to real estate ; their law of August 16,1871, giving power to justices of the peace to issue attachments and replevins, their la-w of August 3, 1871, creating an exemption of part of the personal estate of decedents ; their law of June 26, 1873, authorizing this court to take a drunkard’s estate out of his hands and put him in the hands of a committee, and other similar acts which have been, for the most part ignored by the profession and the court, and tacitly assumed to be of no -force when not approved by Congress.
We are compelled, therefore, to meet the direct question whether Congress could, under the Constitution of the United States, invest a local government in this District with such powers.
Among the other powers conferred by the Constitution, is the power to “ exercise exclusive legislation in all cases whatsoever over such district, not exceeding ten miles square, as may, by cession of particular States, and the acceptance of Congress, become the seat of the Government of the United States.”
It -may be admitted that the term “ exclusive ” has reference to the States, and simply imports their exclusion from legislative control of the District, and does not necessarily exclude the idea of legislation by some authority subordinate to that of Congress and created by it. For enlightenment on this latter subject, we must look to those general principles in regard to the nature of legislative power which seem to be recognized by the authorities.
In this country, where the principles of constitutional law are better understood than elsewhere, it seems perfectly established that the power conferred by a constitution on a *175 legislative body, to make laws, cannot be delegated by that body to any other body or authority, but is regarded as a kind of personal trust reposed in the legislators, the mode of whose election is supposed to contain guaranties of their judgment, wisdom and patriotism. And this is .carried so far, that, according to the weight of authority, even the submission of a law by a legislature to a vote of the people, the source of all authority, would be unconstitutional, and a law expressed to take effect on its approval by a vote of the people would be void.
The rule is 'thus expressed in Cooley on Constitutional Limitations, p. 116, where the authorities are collected, viz: “ One of the settled maxims of constitutional law7 is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign powmr of the State located the authority there it must remain, and by the constitutional agency alone the laws must be made, until the Constitution itself is changed. The power to whose judgment, wisdom and patriotism this high prerogative has been intrusted, cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom or patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.”
In Barto vs. Himrod, 8 New York, 483, the question was, whether a law was valid w'hich provided “ that the electors shall determine by ballot at the annual election, to be held in November next, whether this act shall or not become a law.”
The court said : “ The legislature has no power to make a statute dependent on such a contingency, because it would be confiding to others that legislative discretion w'hich they are bound to exercise themselves and which they cannot delegate or commit to any qther man or men to be exercised. They have no more authority to refer such a question to the whole people than to an individual.”
There has been no decision of the Supreme Court upon *176 this question, but in the case of Murray’s Lessee vs. Hoboken Land and Improvement Co., 18 How., 272, the opinion was stated very clearly by the court, that the judicial power of the United States could not be confided to any other than the tribunals in which the Constitution has vested it; and, clearly, the same rule must apply to the legislative power.
But this fundamental rule, which forbids the delegation of legislative power, is subject to a qualification. It is admitted, that even without any express constitutional ' authority, a legislature may create municipal corporations with certain powers of local government. According to the spirit of our institutions, the regulation of local concerns in a town, is .considered as properly belonging to its inhabitants, and not properly the subject of general legislation ; and it is hardly looked upon as a delegation of legislative authority, properly so-called, to confer this power of regulation on local boards, assemblies, or other inferior officers. It is rather the grant of a power to pass by-laws. Legislative authority for corporate action is of course necessary, and it is always subject to legislative revision and control. But municipal regulation of the internal economy of a town, is universally recognized as something distinct from the exercise of legislation, which is invested by the constitution of a State in its legislature, and cannot be delegated. Cooley Con. Lim., 191.
Connected with this subject are what have been called “ local option laws.”
It has been held to be no departure from the general rule of constitutional law, to submit to the inhabitants of a certain locality, the very question whether they shall be incorporated into a municipal body or not, inasmuch as they, and not the State at large, are the parties interested in that question.
Again, although there is a diversity of opinion on the subject, the weight of authority seems to be that laws relating to the prohibition or licensing of the sale of intoxicating liquors, the licensing of places of public amusement, the punishment of persons keeping gambling houses, and others of like character, which are only to go into operation when *177 approved by vote of the inhabitants of the towns to which they relate, are not unconstitutional. The general reasoning sustaining them is illustrated by the- case of State vs. Noyes, 10 Foster, 293, in which the court say : “Assuming that the legislature has the right to confer the power of local regulation upon cities and towns, that is, the power to pass ordinances and by-laws, in such terms and with such provisions, in the classes of cases to which the power extends, as they may think proper, it seems to us hardly possible seriously to contend-that the legislature may not confer the power to adopt within such municipality a law drawn up and framed by themselves. If they may pass a law authorizing towns to make ordinances to punish the keeping of billiard rooms, &c., they may surely pass laws to punish the same acts, subject to be adopted by the town before they can be of force in it.” And the author, Cooley, says, in a note, p. 124, that “it seems difficult to answer this reasoning, if it be confined to such laws as fall within the proper province of local government, and which are therefore usually referred to the judgment of the municipal authorities or their constituency.”
In other words, the reasoning amounts to this, viz., that if the legislature may confer the general power of regulation as to certain subjects, on the inhabitants of any locality, which includes the power to pass ordinances or by-laws, so they may also authorize such inhabitants to adopt an act of the legislature relating to the same objects as this -would be virtually authorizing them to pass a special ordinance on a subject proper for local regulation. And I think it will be found that every local option law, which has been sustained by the courts, has been one of this local character, which a municipality itself might have been authorized to pass, and the courts which have sustained them have been at pains to declare their adherence to the general doctrine which denies the power of delegating general legislative authority. See Hammond vs. Haines, 25 Md., 541, and other cases cited by Cooley.
It will at once suggest itself, that it is difficult to draw the line between powei’s that are strictly municipal, and *178 may rightly be conferred on local corporations, and those which are properly legislative and cannot be delegated. But this difficulty does not disprove the existence of such a dividing line. A similar difficulty was experienced by the Supreme Court, in the effort to reconcile the exclusive powers of Congress to regulate commerce between the States, and the right of taxation by the State, of persons and property within its limits, where that taxation has seemed to interfere with the free transportation of freight and passengers from State to State.
As that court says, in Osborne vs. Mobile, 16 Wall., 479: “ The difficulty of drawing the line between constitutional and unconstitutional taxation by the State was acknowledged, and has always been acknowledged by this court; but that there is such a line is clear, and the court can best discharge its duty by determining in each case on which side the tax complained of is.”
Notwithstanding the difficulty of laying down geueral rules, there are some subjects to which we can, with reasonably certainty, assign their proper place, as between the State and the municipality. Thus, universal usage and legislation recognize the preservation of public order, morals and health, the regulation of markets and. places of amusement, the inspection of provisions, the improvement and repair of streets, and, as an incident to the others, the levying of general taxes and special assessments, as appropriate powers of a municipality.
On the other hand, titles to property, its transfer and transmission, the form and effect of judicial proceedings, the formalities and effect of contracts, the law of commercial papers, the whole subject of crimes and other subjects of equally general interest, one would naturally assign to the highest legislative authority in a State.
There might be twenty municipalities in one State. Each might have its own powers and its own mode of exercising them, as to the subjects which I have mentioned, as proper to be handled by it. But it is apparent, that the second class of subjects that I have mentioned, should be dealt *179 with by laws operating uniformly through a State. It would never do to have different rules of property, different laws of contract generally, or of commercial paper in particular, different legal proceedings and remedies, and different criminal codes in the different municipalities of a State. It is very plain that the disposition of these subjects by law is the exercise of legislative power, and that, when that is constitutionally vested in a definite legislative body, it cannot, in the nature of things, be delegated to another. The power of making laws derived directly from the people is legislative ; the power of local regulation derived from the legislature is municipal, no matter how limited or extensive the locality embraced by it.
These conclusions will apply to the Congress of the United States, even if we regard it as a mere local legislature, in its relations with the District of Columbia. When it assumed jurisdiction over the District, it found two corporations, Alexandria and Georgetown, in existence, and a few years later it created a third, the city of Washington. Each one of those corporations had a charter, and all the charters differed more or less in detail, while the general features of municipal charters were common to all. It would have been preposterous for Congress to have committed to each the power of regulating or ordaining legal proceedings and remedies, establishing the law of contracts, &c., within their respective corporate limits. Three or four different systems of law would have prevailed, the creatures of municipal action ; and great confusion and perhaps conflict would have prevailed. Each one of these was essentially a municipal corporation, exercising derivative powers of local regulation, and if they had been all consolidated, it is not perceived that their essential character would have been changed.
But there are still more important considerations influencing this question.
Congress is not a local legislature in reference to this District, but it legislates for this District in its character as a national legislature.
In the case of Cohen vs. Virginia, 6 Wheat., 264, this *180 question was disposed of. Cohen was indicted in the Quarterly Sessions court for the borough of Norfolk, in Virginia, for selling lottery tickets contrary to a statute of that State, the sessions court being the highest court having jurisdiction of the case. The defendant defended under the charter of the city of Washington, as an act of Congress, which authorized the drawing of lotteries for certain purposes. On his conviction, a writ of error issued to the Sessions Court from the Supreme Court of the United States.
It was moved to dismiss the writ of error for want of jurisdiction in the Supreme Court.
The motion was denied, and the cause then argued on the merits.
On the question of jurisdiction, it was maintained that this was not a case arising under a law of the United States, in which an authority under such a law was called in question, because Congress, in legislating for the District of Columbia, acts as a local legislature, and not as the Congress of the United States.
Judge Marshall said : “ In the enumeration of the powers of Congress, which is made in the 8th section of the 1st article, we find that of exercising exclusive legislation over such District, &c., &c. This power, like all others which are specified, is conferred on Congress as the legislature of the Union, for strip them of that character and they would not possess it. In no other character can it be exercised. In legislating for the District, they necessarily preserve the character of the legislature of the Union, for it is in that character alone that the Constitution confers on them this power of exclusive legislation. This proposition need not be enforced,” &c., &c.
It is matter of history that the legislation of Congress respecting the internal affairs of the District has in various instances had direct reference to the interests of the people of the States. Thus, non-resident executors and administrators from the States, by act of 1812, were allowed to sue and recover claims in the courts of the District. So, at a later date, it is a matter of private history, that the arrest for *181 debt, here, of a visitor from a State, was the occasion of the abolition by Congress of imprisonment for debt. Other illustrations might be given showing that in practice, as well as theory, the legislation of Congress, for this District, is the exercise of one of the powers conferred on it, as the national legislature.
If this be so, then this power is to be viewed in the same light as the other powers conferred on Congress, viz., those of regulating commerce, borrowing money on the credit of the United States, coining money, &c., &c.
Now, if we suppose Congress to have conferred on the corporation of Washington, or any other municipal body here, the power to regulate commerce between the northern and southern States, in its transit through the District, as by levying tolls on transportation of persons and freight; or of establishing a mint and coining money, &c., we would at once see how glaring an abdication and transfer of its proper functions Congress would be guilty of. The same might be said if Congress had authorized the corporation of Washington to legislate for the District of Columbia. But according to what has been shown, it would be none the less such for Congress to delegate to a municipality of its own creation the power of general legislation, expressly confided to it by the Constitution over this District, including, as in this case, the power to regulate the practice of the courts of the United States here, and to determine the effect of their judgments, and thus ohange the common law of titles derived by us from Maryland, which could only be changed by an act of legislation of the most authoritative character.
We are referred to the laws establishing governments in the territories, as an example of the delegation of its legislative authority by Congress, which has received the sanction of judicial authority.
The clause in question is, “ that Congress shall have power to dispose of and make all needful rules and regulations respecting the territory, or other properly belonging to the United States.”
Now, the question, from what source Congress derives the power to legislate for the territories, has been the subject of *182 much discussion, and cannot be said to be authoritatively settled. The clause in question does not contain the language usually employed in conferring powers of legislation, but apparently refers to mere property. The terms, “ or other property,” would seem to imply, that the territory as property is to be the subject of rules and regulations and disposition.
It has been denied that the power to legislate is derived from this clause, and it was pointedly contrasted, by Chief Justice Taney, in the case of Scott vs. Sanford, 19 How., 393, with the language relating to the District of Columbia.
It has been maintained, that no power of legislation over territories was granted in the Constitution, in terms, or was intended to be so granted, because the government of the existing territories was then already provided for, by ordinances of the Congress of the confederation, and by the terms and conditions of the cessions of territory by Virginia and the other States, and the Constitution did not contemplate or provide for the acquisition of other territories, and that the power actually exercised by Congress, of establishing territorial governments, is simply a consequence of the power to acquire territory by treaty or conquest; and again, that the territorial-governments are substantially the mere exercise of the natural right of self-government, by the new political communities occupying the territories, permittéd and regulated by Congress, which occupies more an international than a constitutional relation to them. On the other hand, a wider 'scope has been given to the power to make rules and regulations, and the power to establish territorial governments has been deduced from it. These questions were merely suggested, first, in the case of Amer. Ins. Co. vs. Carter, 1 Pet., 511; United States vs. Gratiot, 14 Pet., 526, but were debated at great length in the case of Dred Scott vs. Sanford.
Non nostrum est tantas componere lites, but until it can be considered as settled, that the power to dispose of and make all needful rules and regulations respecting the territory, or other property belonging to the United States,” is identical *183 with the power to exercise exclusive legislation over such District as may become the seat of government, the practice of Congress in regard to the territorial governments furnishes us no authoritative guide in the interpretation of the clause relating to the District of Columbia.
The case of Clinton vs. Engelbrecht, 13 Wall., 434, is supposed to give countenance to the idea that the omission of Congress to disapprove is equivalent to a legislative affirmance of the action of the District legislature.
In that case, the only question was, whether a jury ought to have been summoned in conformity with an act of the territorial legislature of Utah territory or with the acts of Congress relating to the courts of the United States. The Supreme Court held the former, reversing the decision of the territorial court. The organic act establishing a territorial government for Utah, like those relating to the other territories, provided that “ all the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States, and if disapproved shall be null and of no effect.” Of course, the inference is that if not disapproved, they shall be deemed valid. In answering objections to the validity of the territorial law, the court say, in substance and by way of argument, that this law must have been transmitted to Congress soon after it was enacted, that it has been on the statute book for twelve years, that a simple disapproval would have annulled it, and as that has not taken place, it is to be presumed that it was impliedly sanctioned by Congress.
But this does not advance us a step in the present argument. If Congress has a right to create territorial governments with power to pass laws which shall operate, proprio vigore, unless disapproved, the omission of Congress to disapprove would doubtless furnish a fair argument in favor of a tacit approval, and that might be sufficient in the case of territorial laws. But we have seen that the power of Congress on this subject is not derived from any clause in the Constitution either authorising or prescribing the exercise of legislation, like the clause relating to the District of Col *184 umbia. How the legislative power of Congress is to be exercised is distinctly set forth in the Constitution. It can only be by bills passed through both houses of Congress and approved by the President, or passed a second time in spite of his disapproval, or becoming operative through his failure to approve or disapprove within a certain time. Hnless Congress can abdicate and delegate its power and duty of legislation to a subordinate agent, there is no such thing known to the Constitution as legislation by silent acquiescence in the acts of snch agent. And thus we are brought back to the question discussed at the outset, viz., whether this power of legislation can be delegated at all.
Reliance is placed, however, on the case of Welch vs. Cook, 97 U. S. R. (7 Otto), 541. The legislative assembly of the District of Columbia, on June 20,1873, passed an act exempting property actually employed for manufacturing purposes from taxation for a period of ten years. Congress, afterwards, by act of June 20, 1878, which abolished the District government, levied a tax on all real estate in the District, with certain exceptions not embracing the property exempted as aforesaid ; and under this act, the Commissioners of the District assessed certain taxes on Welch’s property which was employed for manufacturing purposes, and he filed his bill to enjoin the collection of the taxes. The question was whether the act of the legislative assembly, when acted upon by Welch in expending his money in manufactures on the faith of it, amounted to a contract, or was only a bounty act, repealable at the pleasure of the lawmaking power. Judge Hunt, in delivering the opinion of the court, commenced by saying : “'It is not open to reasonable doubt that Congress had power to invest and did invest, the District government, with legislative authority, or that the act of the legislative assembly of June 20, 1873, was within that authority. We shall, therefore, consider the question as if that act exempting manufacturing property from taxation had been passed directly by Congress.” As applied to the particular case, I am not sure that the proposition stated by the Court is not entirely consistent with *185 the positions we have taken, for we have conceded that legislative or quasi legislative powers for municipal purposes can be conferred on municipal corporations, and the "whole subject of municipal taxation would be embraced by them.
It is said that exemptions from taxation are beyond the sphere of municipal action. Invidious exemptions are inadmissible whether by municipalities or State legislatures, but we do not see why a municipality which is invested with a power of local taxation, may not also be authorized to exempt from taxation churches, schoolhouses and other property, for public ends. It is a dangerous power, and not to be presumed, but we do not understand the authorities to assert it to be essentially extra-municipal, so to speak. The Supreme Court, therefore, does not assert the existence of such extra-municipal power, in holding the language of the Organic Act to confer the power exercised in the particular case. But admitting that the court intended to assert the power in Congress to confer general legislative authority on the District government, what then ? Upon examination of that case, we find that this particular question was not made either in the pleadings or the argument. The counsel for the District Commissioners made no such point, either ignoring it or unwilling to l’ely upon the obnoxious defence to the suit, of ultra vires, and both parties submitted it upon the question whether the exemption law was merely a bounty law or made a case of contract. It was the strongest view of the case for the plaintiff for the court to assume that Congress could and did authorize the District government to pass any law within the scope of general legislative power, and the court, assuming that, proceeded to show that, notwithstanding this, the law in question was a bounty law which could be repealed. . If that court had adopted the very opposite assumption it would not have affected the result of that case. And that court has not been in the habit of treating propositions, assumed under these circumstances, as conclusive, or as precluding further discussions of questions of importance and public" interest. Although the justice delivering the opinion did say that the power of *186 Congress in question could not admit of a doubt, yet, as that was not necessary to the decision of the case, and the discussion and decision proceeded 'upon other grounds, it could hardly be said to amount to more than an assumption for the purposes of the argument, just as in the cases of Bronson vs. Rhodes and Butler vs. Horwitz, 7 Wall., the court assumed the constitutionality of the Legal Tender Acts, but held them to be inapplicable to express contracts to pay in coin; and, yet, in Hepburn vs. Griswold, 8 Wallace, 603, sustained the Court of Appeals of Kentucky in holding the Legal Tender Act of February 25, 1862, void as to previous contracts to pay generally so many dollars.
We are also referred to the decision of this court in United States vs. May, reported in 2 Mac Arthur, 512. May was convicted and sentenced in pursuance of an act of the legislative assembly of the District, entitled, “ an act for the prevention and punishment of abortion, of January 19, 1872. The validity of that act was assailed by the counsel for the prisoner, not on the grounds assumed in this case, but because section 2 of the Organic Act, constituting the District a corporation for municipal purposes, &c., did not authorize the legislature to pass such a law. But Justice Olin found the authority for it in section 49 of the Revised Statutes, conferring legislative authority over all rightful subjects of legislation. We should agree with him in considering that section comprehensive enough to confer the power, if Congress could do it. But whether Congress could confer the power, does not seem to have been discussed in that case, and was not decided. The authority of Congress, not being questioned, was, it is true, tacitly assumed. But even consistency does not require us to forbear from considering and deciding that question when now presented directly for the first time, although the conclusions we have reached would work a different result in a case similar to that of United States vs. May. Both as to the case of Welch, in the Supreme Court, and United States vs. May, in this court, the language of the Supreme Court of California, in the case of Denver vs. Palmer, 21 Cal. R., 500, is appropriate. In refer *187 ring to a theory assumed- by the court in a former case, it says: “ Counsel for the plaiutiff claimed that they were entitled, &c., &c. It was entirely unnecessary for the purposes of the case that we should adopt a different theory. The real points of the controversy can be settled upon the theory adopted by counsel as well as upon any other. So we followed the lead of counsel and assumed for the purposes of our opinion, as they had for the purposes of the trial, &c., &c-The only ground for saying that the case in point is as here represented, and is mere inference that so-and-so is the case because it is so assumed for the- sake of the argument. Neither court nor counsel are bound by conditions which are assumed merely arguendo. To have gone outside the case as. presented by counsel, and discuss a point not at all necessary to the purpose, would have been to erect a windmill merely for the pleasure of running a tilt against it, for nothing could have been said upon the question which would not have been strictly obiter.”
Our conclusion, on thé whole, is, that the act of the District legislature declaring judgments rendered by this court to be liens on equitable interests in land, was an act of legislation which it was only competent for the Congress of the United States to pass, and was in itself totally inoperative and void, and the decree rendered -by the court below must be reversed.