## SMITH v. OLCOTT.

EQUITY; JURISDICTION; APPELLATE PRACTICE; DELEGATION OF LEGISLATIVE POWER; AUCTION SALES AND AUCTIONEERS' FEES; TRUSTEES; DEED OF TRUST SALES; USAGES; COSTS.

1. Where the parties to a suit in equity for an accounting by the holder of a second deed of trust against the trustees in a first deed of trust, who, having sold the property for more than sufficient to satisfy the first trust, have in hand a sum of money applicable to the second trust, enter into a stipulation, the effect of which is to remove all controversy as to the balance actually in hand, leaving only in question whether an auctioneer's fee shall be paid as charged, and thereafter proceed to take testimony and submit the case to the lower court without raising or suggesting in that court the question of jurisdiction, this court will not, on an appeal by the defendants, consider an assignment of error that the bill should have been dismissed for want of jurisdiction in equity; *following* Tyler v. Moses, 13 App. D. C. 428; Slater v. Hamacher, 15 id. 558.

2. So much of section 21 of the act of the late legislative assembly of this District, of August 23, 1871, as fixes the rate of charges by auctioneers for selling real estate in the District at public auction, is void as being an attempt to exercise a general legislative power over the freedom of contracts, which it was not within the power of Congress to delegate.

3. *Quære*, whether, under section 15 of the act of the late legislative assembly of this District of August 23, 1871, prohibiting the sale of real or personal property at auction by one who has not obtained a license as an auctioneer, and providing a penalty therefor, an owner of real estate, or a trustee under a power conferred by

SMITH *v.* OLCOTT

Statement of Case. [19 App.

the owner for the security of another, can, in person, sell the same at public auction, without incurring the penalty prescribed.

4. *Quære,* whether a trustee in a deed of trust upon a sale by him of the trust property at public auction through an auctioneer, is personally chargeable with the payment of the auctioneer's fee, or whether the fee is properly chargeable against the proceeds of the sale.

5. A trustee in a deed of trust is trustee not exclusively for the creditor, but for the debtor as well. His first duty is to the creditor, in respect of making a sale upon default of the debtor where the deed of trust so provides, but in respect of fairly conducting a sale after default, and limiting its expenses within reasonable bounds, he is under an equal obligation to the debtor.

6. If a trustee is entitled to an allowance for auctioneer's charges as part of the legitimate expenses of a sale after default (which point the court does not decide), it is his duty to arrange therefor in advance, for the protection both of the creditor and the debtor.

7. A usage will not be judicially sanctioned which does not tend to promote just dealings between the parties, nor, for a stronger reason, will a usage be recognized by the courts which contravenes a fundamental principle of equity and justice.

8. In a suit in equity involving the question of whether the trustees in a deed of trust, who had sold the trust property at public auction, through an auctioneer, had the right to include in their expense account an auctioneer's fee larger than that admitted by the complainant to be properly chargeable, this court, in *affirming* a decree adverse to the trustees, refused to disturb an award of costs against them.

No. 1092. Submitted October 16, 1901. Decided November 7, 1901.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia, in a suit in equity against trustees in a deed of trust for an accounting.

*Affirmed.*

The COURT in its opinion stated the case as follows:

1. This is a suit in equity against trustees for an account. The bill was filed by Laura I. Olcott against Smith and Kohler, trustees, and others who are formal parties only. The bill alleges the following facts:

(1) On July 9, 1895, Brooke Mackall, then the owner of a certain lot at the corner of New York avenue and Four-

teenth street, in the city of Washington, conveyed the same to Smith and Kohler in trust to secure a note for $65,000, given by said Mackall to one C. C. Harrison, due in three years, and certain other notes for installments of interest thereon.

(2) On February 7, 1898, said Mackall executed a second deed in trust to James E. Fitch, and plaintiff's husband Jacob Olcott (who are the formal parties defendant) to secure a note made by him to plaintiff for $5,000.

(3) The first trust provides, that in case of default by the maker of the note, the trustees " shall sell at public auction the hereinabove granted and described real estate or so much thereof as may be then necessary or so much thereof as may then — subject to this trust at such time and place upon such terms and conditions with such postponement of sale or resale and after such previous public notice not less than ten days as to the said parties hereto of the second part or the survivor or his heirs or substituted trustee shall seem best for the interest of all parties concerned; and (the terms of sale being complied with) shall convey in fee to and at the cost of the purchaser, the premises so sold, such purchaser being hereby discharged from all liability for the application of the purchase-money, and shall apply the proceeds of sale (after paying all expenses of sale, all taxes thereon due, all sums advanced for costs or taxes, or expense of litigation as aforesaid, with interest as aforesaid and a trustees' commission of three per centum on the gross amount of sale) to the payment of the aforesaid indebtedness or so much thereof as may remain unpaid, whether then due or not, with interest unpaid thereon at the rate aforesaid to the date of payment, paying over the surplus, if any, to the said Brooke Mackall his heirs or assigns."

(4) In pursuance of their duty, the said trustees Smith and Kohler advertised said property for sale on October 18, 1898, at public auction.

(5) This sale was regularly postponed until October 24, 1898, and on that day James V. Olcott became the pur-

chaser upon an offer of $71,500, and deposited $500 as security therefor.

(6) Said Olcott did not comply with the terms of the purchase, and the trustees readvertised the property for sale on December 15, 1898.

(7) The sale was had as advertised, and James V. Olcott became the purchaser for the sum of $72,500, which sum he paid to the trustees.

(8) With this payment and the $500 before received, the trustees had in hand $73,000, out of which they paid the note due Harrison amounting with accrued interest to $68,348; their own commissions amounting to $2,175; and the advertising fees, certain revenue stamps and so forth.

(9) The sum remaining amounted to $1,046.76, which they retained to cover the fees of Duncanson Bros., auctioneers, and any costs that may be occasioned on account of said claim.

(10) The following is the account rendered by the auctioneers:

1898.

| | | | | |
|---|---|---|---:|---:|
| Oct. | 24. | Advertising, &c. . . . . . . . . | $105 | 99 |
| | | Commission . . . .,. . . . . . | 728 | 00 |
| Dec. | 15. | Advertising, &c. . . . . . . . | 61 | 06 |
| | | Commission . . . . . . . . . | 743 | 00 |

$1,638 05

By reduction of com. on
    sale of Oct. 24, 1898... $718 00

1899.

Jan'y   6. By cash . . . . . . . . . . . . . .   167 05

885 05

To balance . . . . . . . . . . . . . . .   $753 00

(11) Complainant is still the holder of the said second mortgage note, and as such is entitled to the surplus proceeds of said sale, and she denies the right of the said trus-

tees to contract with auctioneers as a charge upon the property.

(12) Complainant avers that the charges for advertising, sale, stamps, etc., are excessive and improper, and being uninformed as to the true amounts chargeable to the said fund prays an account thereof and for general relief.

2. The answers of defendants admit the general facts alleged, but deny the allegations of improper charges for the expenses of sale. They admit the retention of the surplus of $1,046.76 to cover the demands of the auctioneers and costs of further proceedings.

They admit the rendition of the account by said auctioneers of the balance as stated in the bill and with respect thereto say: "Upon information and belief they aver and say that the commissions claimed by said Duncanson Brothers for such services are proper and lawful; that for crying the first of said sales, in which the husband of the complainant defaulted, the said auctioneers have made a charge of ten ($10) dollars, and that the commissions charged by said auctioneers for crying the second sale, under which the sum of seventy-two thousand five hundred ($72,500) dollars was realized, are those fixed by law and as provided by the acts of the legislative assembly in and for the District of Columbia regulating such sales, and such charges are in conformity therewith, and these defendants say that they would have paid such fees and commissions except for the fact that they were notified not to do so by complainant."

3. Whilst the evidence was being taken before the Commissioner, the parties entered into a stipulation whereby all items of charges by the trustees, save and except the fees claimed by the auctioneers were expressly eliminated from the controversy.

4. The evidence of a number of witnesses was taken concerning the practices and charges of auctioneers, from which it appears substantially: That there are many auctioneers in the District who sell lands at public sale. That the services of these can frequently be contracted for at nominal

charges, say as low often as five dollars per sale, and that contracts are often made in advance.

That it is quite a general practice of trustees representing lenders of money to pay auctioneers a nominal or equitable fee where the proceeds of the sale are not sufficient to pay the secured debt, and to allow them to charge the full fee provided for in the act of the District assembly, when the proceeds sufficiently exceed the debt due and all expenses. That trustees do not make their own sales but engage auctioneers, and in so doing do not consider themselves bound to protect any one in the case of charges of auctioneers except the holders of the secured debt. Witnesses who testified in respect of this practice, when asked, admitted that if they were selling their own property, they would contract with the auctioneer in advance of the sale.

The rule of the Supreme Court of the District of Columbia regulating sales under judicial decree, and the auctioneers' fees of which some witnesses testified, were frequently followed in ordinary sales, permits a charge of one-eighth of one per cent. of the amount of sale as a maximum, with ten dollars as a minimum, and five dollars for an ineffectual sale; and requires this to be deducted from the commissions of the trustees. (Equity Rule 91.)

It further appears that counsel representing complainant, in an effort to raise a new loan on the property for the protection of her second mortgage, called upon the trustees to obtain a statement of the entire amount necessary to pay off the first mortgage and its charges. The statement received was made on September 1, 1898, and is as follows:

| | | |
|---|---:|---:|
| Principal of loan | $65,000 | 00 |
| Six mos. interest at $5\frac{1}{2}\%$ to July 23, '98 | 1,787 | 50 |
| Interest at $5\frac{1}{2}\%$ from July 23rd, '98, to date of sale | | |
| Taxes | 157 | 82 |
| Advertisement (estimated) | 50 | 00 |
| Auctioneer's fee | 100 | 00 |

Trustees' commission, 3% on gross amount of sale.

The negotiations for the loan failing, counsel, on the day and just before the hour of the first sale, called upon the trustees and the fees were discussed. One of them said "the auctioneer would probably charge a pretty big fee." Objection was then made to the payment of any fees greater than the rate prescribed for chancery sales.

On November 2, 1898, the owner of the property addressed a letter to the trustees, protesting against the allowance of any fee in excess of the amount named by them in the statement of September 1, namely — $100.

The evidence showed also that there was considerable difference in the skill of auctioneers, and that Charles C. Duncanson was one of recognized skill who had conducted many important sales. It was shown, however, that the first of the sales in question had not been made by him, but by his clerk.

5. The court, upon the hearing, refused to be bound by the provisions of the act of assembly prescribing auctioneers' fees at the rate rendered in the account but made an allowance therefor of $100, and entered a decree compelling the trustees to pay over the remainder of the fund to the complainant, to whom costs were also awarded.

*Mr. Leon Tobriner* for the appellants:

1. As the trustees in the exercise of the discretion vested in them under the deed of trust, did not exceed the rates limited by law to be charged by auctioneers, there is no ground for controlling their action by a resort to legal proceedings. A court of equity should only interfere with a conventional trustee when he abuses the trust, or is guilty of misconduct. *Anderson* v. *White,* 2 App. D. C. 408.

So long as trustees confine themselves to the provisions of the law there is no abuse of their discretion. In this case they had a right to employ a competent auctioneer, and to pay him for his services. The circumstances demanded that they employ the best. If the legislative act is interpreted as

fixing a maximum of commission to be charged by auctioneers it is a valid act and so long as the trustees pay no more than is permitted by the act, so long are they within the exercise of their discretion. The trustees desired the services of Mr. Duncanson; they were not entitled to such service as a matter of right, at any remuneration that they might fix; he had a right to say on what terms he would serve them, and if the compensation asked by him and which the trustees are willing to pay, is not in excess of the rates prescribed by law, it is immaterial what others would have performed the services for. Because the trustees pay a higher compensation to the auctioneer than the complainant or her attorneys would have paid, is not evidence of such misconduct as will justify a court in interfering and controlling their action in the execution of the trust.

The deed of trust requires a sale at public auction. It authorizes the payment of all expenses of sale, as also a trustee's commission of three per centum.

The parties having required a sale by public auction must have anticipated *as part of the expenses of sale* the compensation to be paid to an auctioneer in making such public sale. The commission provided for the trustees is a " trustee's commission." There is no provision that thereout should be paid the auctioneer's fees. On the same principle complainants might contend that the advertising expenses should be paid out of the trustee's commission. *Brady* v. *Dilley,* 27 Md. 570.

2. The trustees in this case simply adopted the practice and followed the custom in vogue in the District for many years as to the compensation to be paid to the auctioneer; it is admitted that there is a difference in the compensation demanded by auctioneers, just as there is a difference in the fees asked by attorneys or other professional men for their services. There is also a difference in ability. There is not a scintilla of evidence in this record that any other auctioneer would have rendered the services performed by Duncanson Bros. for less than the amount charged by them, or that the charge was unreasonable. The only testimony is that of Mr.

Duncanson, who testifies to the reasonableness of the charges. No auctioneer was produced by complainant for the purpose of showing the value of such services or that they could have been obtained at a less figure.

3. The attention of the court is also called to the fact that the bill herein was originally filed under the guise of a bill for an accounting, charging that the appellants as trustees had wrongfully laid out and expended certain sums of money for internal revenue stamps and title company's bill; had employed an auctioneer without authority of law, and that the amount claimed for advertising was excessive and improper, and that she had no information as to the exact amount of the balance in the hands of the appellants.

It appears that at the beginning of the taking of testimony the complainants abandoned every objection except that as to the auctioneer's compensation, and it further appears that one of the exhibits filed with the complainant's bills, is exhibit marked " E," which complainant alleges is " a true copy of what was rendered complainant by said defendants as an account of their trust as aforesaid." This exhibit is a statement by the appellants herein of their account as trustees. There is no averment in the bill that complainant had demanded an accounting from the defendants, and that such demand had been refused; nor could such averment, in the light of the exhibit attached to the bill, have been truthfully made.

The allegation of such a demand and a refusal is a material one.

We do not understand that a complainant, simply for the purpose of obtaining a foothold in a court of equity, can allege causes which would be grounds for a bill for an accounting, subsequently abandon them, and litigate a question for which he has an adequate remedy at law. This is what the complainant did and it seems to us that the bill for this reason should have been dismissed.

4. The appellants were only trustees; they had rendered their account; there was no refusal on their part so to do and they should not be required to pay costs. That they acted

cautiously is evidenced by the fact that they did not pay the bill of the auctioneer, when presented, but reserved the amount as shown by their statement filed by the complainants' bill.

On one side the claim of the auctioneer was presented to them, on the other side it was objected to by the second mortgagee.

Without incurring liability they could do nothing but wait the result of litigation. It is doubtful that the decree in this case, if adverse to the allowance of the claim, will settle the matter. Duncanson Brothers, the auctioneers, are not made parties to the cause and consequently the decree herein is not binding upon them. Whilst it might settle the rights of the complainants and the defendant trustees, it would still leave the trustees liable to litigation at the suit of Duncanson Brothers. Duncanson Brothers should have been made parties to the proceedings. Under the circumstances, the trustees should not have been charged with the costs of these proceedings, especially as they were not in default in the performance of any duty.

*Mr. Wharton E. Lester* (*Mr. William Birney* being with him on the brief) for the appellee:

1. The deed creating the trust under which appellants acted did not authorize the trustees to employ an auctioneer to cry the sale. They had not that power, therefore, unless it was necessary to the proper execution of the trust.

Appellants as trustees held the legal title to the land. They received a commission of twenty-one hundred and seventy-five dollars ($2,175) for their services. These services included selling the land at public auction. They should have cried the sale themselves, or if they preferred to employ an agent to perform their duty they should pay him out of their commissions. Such is the provision of the Equity rule of the Supreme Court of the District of Columbia.

The act of the legislative assembly of August 23, 1871, chapter 69, does not prohibit trustees from crying auction

sales of their own property. The title of the act shows that it was intended " to regulate trades, business and professions." The organic act of 1871, entitled "An act to provide a Government for the District of Columbia," clause 38, says: " No act shall embrace more than one subject and that shall be expressed in its title; but if any subject shall be embraced in an act which shall not be expressed in its title, such act shall be void only as to so much thereof as shall not be expressed in its title."

If chapter 69 was intended to prevent owners from dealing with their own; to prevent a man from selling his own property at auction; it would violate the inherent right of an individual to do with his own as he pleases, subject to the recognized limitations.

2. If appellants were authorized to employ an auctioneer, and pay him out of the proceeds of the sale, other than the commission reserved to themselves by said deed, by practice, or otherwise, they were in duty bound to make the best possible arrangement with the auctioneer, and pay him only a reasonable compensation for his services. They must show that they performed their duty in this respect. They were trustees for the holder of the equity of redemption in said land as well as for the beneficiary named in the deed. The legal title was in them, and they should have exercised that care and prudence in the execution of the trust in the same degree that a prudent man would deal with his own, and they are liable for all losses or deficiencies occasioned by their affirmative or negative violation of this obligation. Pomeroy, Eq. Jur., Sec. 1070; *Hun* v. *Cary,* 82 N. Y. 65.

3. Appellants contend that under the second clause of section 21 of the act aforesaid, they are justified in paying the auctioneer the amount he charged. If that provision is law, and be literally interpreted apart from the title of the act, they are correct. The act is entitled —

"An act imposing a license on trades, business and professions practiced or carried on in the District of Columbia."

Appellee contends that said clause is void, because — It violates the property and liberty right of contract. It de-

prives the owner of land selling by auction of his property without due compensation, and without due process of law. It is general legislation, and beyond the power of the legislative assembly to enact. *Ritchie* v. *People,* 29 L. R. A. 79, and notes; *Denis* v. *Moses,* 40 L. R. A. 302, and notes; *State* v. *Loomis,* 21 L. R. A. 790, and notes; *Braceville Coal Co.* v. *People,* 147 Ill. 67; *Liep* v. *Railway Co.,* 58 Ark. 418; *Shaver* v. *Pa. Co.,* 71 Fed. Rep. 931; *Commonwealth* v. *Perry,* 155 Mass. 117; *Low* v. *Rus. Pr. Co.,* 44 L. R. A. 702; *State* v. *Goodwill,* 6 L. R. A. 621; *Lake County Comrs.* v. *Rollins,* 130 U. S. 662; *St. Paul, M. & M. RR. Co.* v. *Phelps,* 137 U. S. 528; Bateman on Auctioneers, 225; *Roach* v. *Van Riswick,* MacA. & M. 171; *Cooper* v. *District of 'Columbia,* MacA. & M. 250; *Saville* v. *District of Columbia,* 1 MacA. 581; *Waggaman* v. *District of Columbia,* 4 M. 328; *Re Hennick,* 129 U. S. 141; Dillon, Municipal Corporations, Sec. 325.

4. Appellee could obtain relief only in equity. She had no standing at law, for no privity of contract existed between herself and the trustees under the first deed of trust. She did not know the balance in their hands to which she was entitled, and if for satisfactory reasons to herself she abandoned some of the items of expenditure her position is not changed.

Mr. Justice Shepard delivered the opinion of the Court:

1. The first error assigned is, that the bill was not dismissed for want of jurisdiction in equity.

There is no merit in this contention. Courts of equity have general jurisdiction in respect of bringing trustees to account and final settlement, and it is conceded that the bill would lie as originally framed. But it is contended that the stipulation accepting the trustees' account as stated, and removing all controversy as to the actual balance in hand, thus substantially amending the bill, left nothing in controversy that was not plainly remediable at law, notwithstanding that the trustees withheld the fund to secure the payment of the

charges of their auctioneers, and to indemnify themselves for expenses they might incur in maintaining the justice of those charges.  Moreover, the complainant, as holder of the note secured by the second mortgage, had no legal title to the surplus proceeds of the sale.  It would serve no useful purpose, however, to consider and determine whether the court, at the hearing, could, without error, have dismissed the bill and remitted the parties to proceedings at law.

There was nothing to indicate bad faith in any of the allegations of the bill that were met by the stipulation.  Both sides proceeded to take testimony after the stipulation, and submitted the case thereon.  The question of jurisdiction in equity was not raised or suggested at any stage of the proceeding below, and, for reasons given at length in former decisions of this court, will not be considered.  *Tyler* v. *Moses,* 13 App. D. C. 428, 443; *Slater* v. *Hamacher,* 15 App. D. C. 558, 569.

2. The second assignment of error raises the substantial question upon which the case turns, namely, whether the fees of the auctioneer are to be governed by the act of the District assembly, fixing the same.

That body, when in existence, on August 23, 1871, passed "An act imposing a license on trades, businesses and professions practiced or carried on in the District of Columbia." The fifteenth section of this act prohibited the sale of real or personal property at auction by one who shall not have obtained a license as auctioneer, and provided a penalty therefor.  Every auctioneer and real estate agent was also required to give a bond for the observance of the duties imposed.  Section 21 requires auctioneers to pay an annual tax consisting of a fixed sum and a percentage of gross receipts, and concludes in the following terms:  "And the rates of charges on the sale of real estate at public auction shall be five per cent. on the first two hundred dollars, two per cent. on the next one thousand dollars, and one per cent. on all amounts in excess of that sum."

So much of the fifteenth section as imposes a tax upon real estate agents, and requires of them a bond, has been upheld

by the Supreme Court of the District, in General Term, and the same decision would, for a stronger reason if anything, apply to auctioneers. *District of Columbia* v. *Waggaman,* 4 Mack. 328.

The District assembly enacted many acts and regulations that have been in question before the courts and some of them have been declared in excess of the powers that could be constitutionally conferred by Congress upon the local municipal government. *Roach* v. *Van Riswick,* MacA. & M. 171; *Stoutenburgh* v. *Hennick,* 129 U. S. 141.

In the first of those cases, the general term declared it beyond the power of Congress to delegate to the assembly the power to enact a law making the judgments of the District courts liens upon equitable interests in real estate. The reasoning of the opinion delivered by Mr. Justice Cox amply demonstrates the soundness of the conclusion.

In *Stoutenburgh* v. *Hennick, supra,* the Supreme Court of the United States had under consideration a section of the same act now before us, which imposed a license tax upon commercial agents.

The right to tax as to those engaged in soliciting business for persons outside of the District, was denied. The power of Congress in respect of legislation for the District of Columbia, and the limitation upon the delegation of that power were thus stated by Chief Justice Fuller, who delivered the opinion of the court: " It is a cardinal principle of our system of government, that local affairs shall be managed by local authorities, and general affairs by the central authority, and hence, while the rule is also fundamental that the power to make laws cannot be delegated, the creation of municipalities exercising local self-government has never been held to trench upon that rule. Such legislation is not regarded as a transfer of general legislative power, but rather as the grant of the authority to prescribe local regulations, according to immemorial practice, subject of course to the interposition of the superior in cases of necessity."

Congress has express power " to exercise exclusive legislation in all cases whatsoever," over the District of Columbia, thus possessing the combined powers of a general and of a State government in all cases where legislation is possible.    But as the repository of the legislative power of the United States, Congress in creating the District of Columbia " a body corporate for municipal purposes," could only authorize it to exercise municipal powers.

Applying this rule to the clause of the section, above quoted, we are of the opinion that its enactment was beyond the power conferred upon the District assembly.

It is not a mere local regulation within the scope of the powers ordinarily delegated to municipal corporations, but an attempt at the exercise of a general legislative power over the freedom of contracts.

It is essentially different from the power exercised in other parts of the act in the matter of regulating the occupation of auctioneers, and laying a license tax upon the same.

It also differs from those enactments, frequently made by municipal bodies under special delegations of power, which regulate the charges, by fixing a maximum rate, of all persons engaged in certain particular callings, as for example, hackmen who make special use of the public streets and places in the pursuit of their regular calling.

It will be observed that the regulation in question does not undertake to fix a maximum rate of charges for auctioneers, leaving parties free to contract for less if they see proper, but undertakes to prescribe one absolute, invariable charge for all sales of real estate.    In this respect it resembles an act prescribing the fees of public officers, for official services compulsorily rendered, and which, as a matter of sound public policy, are not permitted to become the subject of special contract.

This resemblance is increased by the terms of section 15 which provides that " no person whatsoever shall sell at auction    *    *    *    without having first obtained a license therefor," and contains no exception permitting an owner

to sell his own property at a particular auction sale, where such acts of sale do not constitute a business.

3. No question is presented by this record that requires us to consider whether, under the terms of section 15, an owner of real estate, or a trustee under power conferred by the owner for the security of another, could, in person, sell the same at public auction without incurring the penalty prescribed. There is nothing in the nature of the trust, in this case, that would render it improper for the trustees to have the sale cried, in their presence and under their supervision and control, by a skilled auctioneer, when in their judgment it would tend to enhance the price obtained.

But whether, having so conducted a sale, the trustees could lawfully make the reasonable fees of the auctioneer a charge against the proceeds; or whether, being charged with the express duty of making the sale, the fees of the auctioneer representing them therein should not be a charge against them personally, are questions, also, that we are not called upon to determine. The record shows, that the complainant recognized the auctioneer's fees as chargeable against the proceeds of the sale, and was willing to allow a charge reckoned in accordance with the rates prescribed by rule of court for chancery sales. The amount allowed by the court in the final decree to be retained by the trustees for the payment of the auctioneers was fixed substantially on that basis, and was acquiesced in by the complainant who took no exception and prosecuted no appeal.

The sum allowed by the court was, under the testimony, sufficient compensation for the services rendered in making the actual sale, and we do not understand the appellants as objecting to the same independently of the claim to compensation founded on the provisions of the act of assembly that has been declared void. We say actual sale, because the appellants, founding their contention upon the act of assembly, are in no condition to claim that the first sale was effectual, for the testimony shows that it was not conducted

by the licensed auctioneer, but by a clerk in his service who does not appear to have had a license under the requirement of section 15, which stands unaffected by the conclusion in respect of the objectionable clause of section 21. There is nothing in section 15 that indicates the existence of authority on the part of a licensed auctioneer to act by deputy or agent.

4. We cannot regard the testimony tending to show a common practice on the part of trustees in this District, in cases of trusts to secure loans, to stipulate for nominal, or reduced charges by the auctioneers, provided the proceeds of sale are insufficient to pay the entire amount of the debt and expenses, and to permit them to exact the exorbitant fees estimated according to the rate of the act of assembly, where there shall be a surplus, as furnishing any basis for allowance in this case. Appellants were trustees, not exclusively for the holder of the loan, but for the mortgagor as well. Their first duty was to the creditor, in respect of making a sale upon default of the mortgagor, because the instrument creating the trust so provides; but in respect of conducting the sale fairly and limiting its expenses within reasonable bounds, they were under an equal obligation to the mortgagor.

There is nothing in the opinions of this court in former cases, one of which has been cited, that is not in strict accord with this equitable principle. *Anderson* v. *White*, 2 App. D. C. 408, 419; *Wheeler* v. *McBlair*, 5 App. D. C. 375, 384; *S. C.*, 172 U. S. 643.

Assuming, then, that the trustees were entitled to an allowance for auctioneers' charges as part of the legitimate expenses of the sale, it was their duty to arrange therefor, in advance, for the protection of the mortgagor's interests as well as those of the holder of the first secured note.

The testimony showing the existence of a practice to the contrary does not make it an established usage commonly recognized and acquiesced in by all persons interested in such matters; but if it were shown to exist as a usage we

would not countenance its enforcement. Courts will not give their sanction to usages which do not tend to promote just dealings between parties, and, for a stronger reason, they will not recognize one that contravenes a fundamental principle of equity and justice.

5. The last error assigned is founded on so much of the decree as awards costs against the appellants. Passing by the question of the appealable nature of such an order, the award of costs in a proceeding in equity is a matter of sound discretion, the exercise of which, as in other orders of that nature, will never be disturbed save in plain cases of its abuse.

In the award of costs the court was undoubtedly influenced by the particular conditions of the case developed by the testimony.

In the first place, the probable charges of the auctioneer had been the subject of discussion between the parties, in ample time for the settlement of the same by special contract before the first and ineffectual sale; and before the final sale, the mortgagor and the complainant had protested against any charge greater than that finally allowed by the court.

In the second place, it appears that the litigation began in the purpose to enforce the claims of the auctioneer, at the exorbitant rate prescribed by the act of assembly, and that the auctioneer has assisted in maintaining the litigation for the purpose of asserting the binding obligation of that act.

We find no error in the decree appealed from, and it will be affirmed, with costs.            *Affirmed.*