## DISTRICT OF COLUMBIA v. JOHN R. THOMPSON CO., Inc.

### No. 967.

Municipal Court of Appeals for the

District of Columbia.

Argued Feb. 28, 1951.

Decided May 24, 1951.

Chester H. Gray, Principal Asst. Corporation Counsel, Washington, D. C., with whom Vernon E. West, Corporation Counsel, and Edward A. Beard, Asst. Corporation Counsel, Washington, D. C., were on the brief, for appellant.

Ringgold Hart, Washington, D. C., with whom John J. Wilson and Jo V. Morgan, Jr., Washington, D. C., were on the brief, for appellee.

Phineas Indritz, Washington, D. C., for Greater Washington Area Council of American Veterans Committee, Inc., amicus curiæ.

Harry C. Lamberton, James A. Cobb and Joseph Forer, all of Washington, D. C., for District of Columbia Chapter, National Lawyers Guild, amici curiæ.

Sanford H. Bolz, Stanley B. Frosh, William C. Koplovitz and Phineas Indritz, all of Washington, D. C., for American Council on Human Rights et al, amici curiæ.

Foster Wood, Washington, D. C., for Washington Chapter, Unitarian Fellowship for Social Justice, and The Washington Friends Joint Social Order Committee, amicus curiæ.

Leroy H. McKinney, Washington, D. C., for Washington Bar Ass'n, Inc., amicus curiæ.

David Rein, Washington, D. C., for Coordinating Committee for Enforcement of D. C. Anti-Discrimination Laws, amicus curiæ.

Margaret A. Haywood, Washington, D. C., on behalf of a group of twelve citizens of District of Columbia, amicus curiæ.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

The District of Columbia appeals from an order of the Municipal Court quashing an information which charged that defendant John R. Thompson Company, Inc., a restaurant operator, had in violation of law refused to serve prospective patrons because they were of the Negro race.

The information stated the charge in four separate counts and the matter was presented to the trial court on an agreed statement of facts from which it appears that three persons of the Negro race, who concededly were "well-behaved and respectable persons," entered defendant's restaurant and asked to be served, but were told by defendant's local manager "that it was not the policy of the restaurant to serve members of the Negro race." Defendant then and there refused to sell or otherwise accommodate the three aforesaid persons, or any of them, solely because of race and color. This the government charged was in violation of two Acts of the Legislative Assembly for the District of Columbia passed respectively in 1872 and 1873.

In a written memorandum,[1] the trial judge ruled that the Acts of the Assembly were valid and "in their objective light were not unreasonable," but he also ruled that the Acts had been repealed by implication and proceeded to dismiss or "quash" the information. Thus the case comes here for review on appeal by the District of Columbia. In addition to the briefs of appellant and appellee, there have been filed with our permission several briefs of amici curiæ as indicated in the caption.

The government assigns as error the ruling that the Acts of the Legislative As-

1. The memorandum was actually filed in an earlier case brought against the same defendant, Municipal Court Criminal Case No. 99150, involving the same offense, but it was adopted by the same judge who wrote it as the basis for his decision herein.

sembly had been repealed by implication. Appellee contends not only that the Acts are no longer in force, but that they were void *ab initio*.

*The Legislative Background.*

By Act of the Congress of the United States passed on February 21, 1871, a government was set up for the District of Columbia. 16 Stat. 419. Section 5 of the Act vested legislative power in a Legislative Assembly, specifying certain conditions and reserving to the Federal Congress certain enumerated legislative powers and also supervisory control over the Legislative Assembly. In one section (18) it was separately provided "That the legislative power of the District shall extend to all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act, subject, nevertheless, to all the restrictions and limitations imposed upon States by the tenth section of the first article of the Constitution of the United States; but all acts of the legislative assembly shall at all times be subject to repeal or modification by the Congress of the United States, and nothing herein shall be construed to deprive Congress of the power of legislation over said District in as ample manner as if this law had not been enacted."

Acting under the Congressional authority just recited, the Legislative Assembly on June 20, 1872, Comp.St.1894, c. 16, § 148 et seq., enacted the following: *"And be it further enacted,* That any restaurant keeper or proprietor, any hotel keeper or proprietor, proprietors or keepers of ice-cream saloons or places where soda-water is kept for sale, or keepers of barber shops and bathing houses, refusing to sell or wait upon any respectable well-behaved person, without regard to race, color, or previous condition of servitude, or any restaurant, hotel, ice-cream saloon or soda fountain, barber shop or bathing-house keepers, or proprietors, who refuse under any pretext to serve any well-behaved, respectable person, in the same room, and at the same prices as other well-behaved and respectable persons are served, shall be deemed guilty of a misdemeanor, and upon convic-

tion in a court having jurisdiction, shall be fined one hundred dollars, and shall forfeit his or her license as keeper or owner of a restaurant, hotel, ice-cream saloon, or soda fountain, as the case may be, and it shall not be lawful for the [Register] or any officer of the District of Columbia to issue a license to any person or persons, or to their agent or agents, who shall have forfeited their license under the provisions of this act, until a period of one year shall have elapsed after such forfeiture." Ch. L.I, Sec. 3.

A year later, on June 26, 1873, Comp.St. 1894, c. 16, § 151 et seq., the succeeding Assembly enacted much lengthier sections dealing with the conduct of restaurants, eating houses, and similar establishments, and again made it a violation of law to refuse to serve "any well-behaved and respectable person or persons who may desire the same" or to discriminate against any such person in any one of several ways.

*The Validity of the Acts.*

■ We must first consider the contention of defendant restaurant keeper that the Acts were void. The first contention is that these were not mere regulations but Acts of general legislation and therefore beyond the power of the Assembly to enact. The trial court ruled otherwise, and I think correctly. I think that Congress clearly had the power under the Federal Constitution to delegate to the local Assembly the right to promulgate regulations of this type. I also think that a municipality has the right in the exercise of its general police power to regulate the conduct of public eating places for the protection of the public health, safety and order. Further, I think that in passing the Acts here in question the Assembly was not creating new rights, as the defendant contends, but was merely, by local regulation, defining and assuring the observance of existing rights of citizens within the local jurisdiction. Decisions of the Supreme Court and of the local appellate courts support this view. Stoutenburgh v. Hennick, 129 U.S. 141, 9 S.Ct. 256, 257, 32 L.Ed. 637, relied on by both parties, invalidated an Act of the Assembly on the

premise that by imposing licensing restrictions on commercial agents doing business outside the District, it constituted a regulation of interstate commerce which could not properly be interfered with by local government. But the court recognized that "local affairs shall be managed by local authorities," and that though the power to make some·laws cannot be delegated, "the creation of municipalities exercising local self-government has never been held to trench upon that rule."

The Supreme Court of the District of Columbia [2] in Roach v. Van Riswick, MacArthur & Mackey, 11 D.C. 171, held invalid an Act of the Assembly which made court judgments operate as liens on equitable interests in land, the court ruling that this was general legislation and hence in the sole province of Congress. "We cannot doubt, however," said the court, "that Congress intended to confer on the District government the fullest legislative power with certain express restrictions. Their power is declared to extend to all rightful subjects of legislation consistent with the Constitution and the provisions of the organic act, and subject to the restrictions and limitations imposed upon the States by·the 10th section of the first article of the Constitution." The court also recognized that "the regulation of local concerns in a town, is considered as properly belonging to its inhabitants * * * and it is hardly looked upon as a delegation of legislative authority."

A few months later the same court in Cooper v. The District of Columbia, MacArthur & Mackey, 11 D.C. 250, 251, referring to the Roach case, said, "All that was decided there was that Congress had no right to bestow upon the legislative assembly of the District any powers which were not necessary for it *as a municipality;* but the decision expressly, in more than one place, declares that whatever was granted by ·Congress to the legislative assembly of the District, in respect to matters properly pertaining to municipal government, was a valid grant."

Another case relied on by appellee is Smith v. Olcott, 19 App.D.C. 61. There the Court of Appeals of the District of Columbia, created in 1893,[3] held invalid a section of a licensing statute prescribing maximum charges which could be made by auctioneers on the ground that it set forth "one abso·lute, invariable charge for all sales of real estate." The decision added nothing to what had already been said in the Stoutenburgh case.

The most recent case applicable to the subject matter is Johnson v. District of Columbia, 30 App.D.C. 520, decided in 1908, in which the court refused to declare invalid an 1871 Act of the Legislative Assembly prohibiting cruelty to animals. The court held the Act to be a mere police regulation and hence within the scope of powers delegated by Congress to the municipality, citing Stoutenburgh v. Hennick, 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637, and Smith v. Olcott, 19 App.D.C. 61. "Cruel treatment of helpless animals," said the court, "at once arouses the sympathy and indignation of every person possessed of human instincts,—sympathy for the helpless creature abused, and indignation towards the perpetrator of the act; and in a city, where such treatment would be witnessed by many, legislation like that in question is in the interest of peace and order and conduces to the morals and general welfare of the community." I shall not labor the obvious analogy between that enactment and the ones now before us. I think the interest of good government, public peace and order, morals and the general welfare of the community require the courts to hold that this was a reasonable and proper exercise of the police power. I think we may take it as true that these Acts were in furtherance of the purposes of the 13th and 14th Amendments to the Constitution and that they were in the spirit of the Civil Rights Acts of that era. But it by no means follows that the label of "general legislation" must be affixed to them. In purpose and scope they were merely local and regulatory and under the

2. Now the United States District Court for the District of Columbia.

3. Now the United States Court of Appeals for the District of Columbia Circuit.

several decisions above-referred-to were properly delegable by Congress to the local Assembly.

Another argument made by defendant is that the Acts interfere with its freedom of contract. But as Chief Justice Hughes said in West Coast Hotel Company v. Parrish, 300 U.S. 379, 392, 57 S.Ct. 578, 582, 81 L. Ed. 703, "freedom of contract is a qualified, and not an absolute, right." [4] Thus the test is whether there was such interference as to be *unreasonable in law.* See Western Turf Association v. Greenberg, 204 U.S. 359, 27 S.Ct. 384, 51 L.Ed. 520. I think we cannot say that there was.

Nor can I approve defendant's contention that the Acts are discriminatory because barrooms were not included in the first Act nor hotels in the second. Defendant does not operate either a barroom or a hotel and hence cannot be heard to complain of the alleged discrimination. As the government points out in its reply brief, one who attacks a statute as unconstitutional must show that he is within the class of persons as to whom it is unconstitutional and that he is injured thereby. If he is not hurt he cannot complain. Heald v. District of Columbia, 259 U.S. 114, 42 S.Ct. 434, 66 L.Ed. 852; Tyler v. Judges of the Court of Registration, 179 U.S. 405, 21 S. Ct. 206, 45 L.Ed. 252; Hendrick v. Maryland, 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385; Sprout v. City of South Bend, Indiana, 277 U.S. 165, 48 S.Ct. 502, 72 L. Ed. 833; Aetna Ins. Co. v. Hyde, 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed 357; Corporation Commission of Oklahoma v. Lowe, 281 U. S. 431, 50 S.Ct. 397, 74 L.Ed. 945; Shearer v. Burnet, 285 U.S. 228, 52 S.Ct. 332, 76 L.Ed. 724; Marblehead Land Co. v. City of Los Angeles, 9 Cir., 47 F.2d 528. The same rule applies against one attacking a municipal ordinance. 62 C.J.S., Municipal Corporations, § 433. Moreover, the two Acts are cumulative in nature and operation and should be read together.

As to defendant's contention that the Acts are unreasonable, I note that District of Columbia v. Waggaman, 4 Mackey 328, 15 D.C. 328, held that when there is an express legislative grant of power, courts have nothing to do with the reasonableness of an ordinance enacted under it, but can only construe the extent of the grant.

The Acts are also attacked on the ground that they provide for the forfeiture of licenses. But the object of these Acts is not the collection of a fine or the revocation of a license. See District of Columbia v. Brooke, 29 App.D.C. 563. These are merely the enforcement features of the Acts.

Nor is there merit in defendant's contention that the Acts must fail because the Municipal Court was given no power to forfeit licenses. The short answer is that such power need not and does not rest in the court but in the District of Columbia Commissioners who issued the license in the first place. And there are many instances in which the Commissioners have the power to revoke licenses as a result of court judgments [5] or independently of court action.[6]

I am clear in my view that the Acts under consideration were valid and became the subsisting and binding law of this jurisdiction.

*Are the Acts presently enforceable?*

The Municipal Court, as we have seen, ruled that the Acts were valid when enacted, but have since been repealed "by implication." Defendant-appellee also advances the argument that they have been expressly repealed.

It must be kept clearly in mind that Congress has consistently recognized the validity and binding force of Acts of the Legisla-

4. To the same effect is Radice v. People of State of New York, 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690.

5. E. g., revocation of automobile operator's permit on conviction of operating under the influence of intoxicating liquor, Code 1940, § 40–609(b); revocation of operator's permit for failure to satisfy judgment arising from collision, Code 1940, § 40–403; revocation of money lender's license for conviction of violating Loan Shark Law, Code 1940, 26–606.

6. Code 1940, §§ 1–232, 2–1405, 2–1505, 47–2303, 47–2345.

tive Assembly, though in some instances it disapproved certain enactments by expressly repealing or amending them. For example, in 1887 Congress expressly repealed parts of two Acts of the Assembly relating to license taxes on real estate agents and provided for a new tax, 24 Stat. 368, and in 1891 expressly amended a provision of an Act relating to license taxes on second-hand dealers, 26 Stat. 841.

Just as the courts have always recognized the express repeal of an Act of a Legislative Assembly,[7] they have also recognized that Acts and parts of Acts of the Assembly which had not been expressly disapproved by Congress retained the status of valid legislation. Cooper v. District of Columbia, MacArthur & Mackey, 1880, 11 D.C. 250; District of Columbia v. Waggaman, 1885, 4 Mackey 328, 15 D.C. 328; District of Columbia v. Burgdorf, 1895, 6 App.D.C. 465; District of Columbia v. Weaver, 1895, 6 App.D.C. 482; Parsons v. District of Columbia, 1896, 8 App.D.C. 391; Lasley v. District of Columbia, 1899, 14 App.D.C. 407; Johnson v. District of Columbia, 1908, 30 App.D.C. 520.

 In reaching the conclusion that the Acts had been repealed by implication, the trial judge said:

" * * * The basis for this conclusion is to be found in a consideration of the Organic Act of 1878 which first established a complete and permanent form of government for the District of Columbia and of the subsequent execution thereunder of the wide authority vested in the Commissioners through their promulgation of many municipal ordinances dealing with the ownership, control, maintenance and operation of establishments dispensing food and drink in the District.

"The 1878 Act was passed for the express purpose of providing a complete form of permanent government for the District of Columbia and for legislative substitution for all previous legislation enacted dealing with the same subject matter. It seems inescapable that, if this premise be correct, then the Acts of 1872 and 1873 as such, although not directly repealed, have both been repealed by implication."

In considering this ruling I think courts must be guided by the cardinal principles that repeal by implication is held in disfavor and that the intention of a legislature to repeal must be "clear and manifest". United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 188, 84 L.Ed. 181; United States Alkali Export Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554.

There is nothing in the temporary Organic Act of June 20, 1874, 18 Stat. 116, or in any provision of the permanent Organic Act of June 11, 1878, 20 Stat. 102, that can be said to repeal these Acts. Though great reliance is placed on Eckloff v. District of Columbia, 4 Mackey 572, 15 D.C. 572, affirmed 135 U.S. 240, 10 S.Ct. 752, 34 L.Ed. 120, and District of Columbia v. Hutton, 143 U.S. 18, 12 S.Ct. 369, 36 L.Ed. 60, for the proposition that the provisions of the Organic Act repealed by implication a former provision of the Assembly, the cases are easily distinguishable. In both cases, which concerned Acts involving the local police force, the court could and did point to a specific power delegated to the Commissioners by the 1878 Act regarding appointment and removal of policemen which, on the facts, was so broad and inclusive that it was held not to be limited by any prior enactment on the same subject. In the Hutton case, the court made it clear that it was ruling that *only* Section 354 of the Revised Statutes for the District of Columbia was repealed by Section 6 of the Organic Act. Nowhere is there a ruling that *all* preexisting laws were repealed. Moreover, in both the Eckloff and Hutton cases there was presented a basic and fundamental conflict between prior enactments and the 1878 Act of Congress—a situation which by no means exists here. Also, both cases

7. In Lansburgh v. District of Columbia, 11 App.D.C. 512, the court recognized that the Assembly's Act defining and authorizing "gift enterprises" under prescribed tax rates had been changed by Congress into a prohibition of the same defined activity, and sustained a conviction under the new statute.

dealt with an administrative problem of the Government newly established by the 1878 Act, while in the case at bar we have no such problem: we deal only with an enactment regulating the conduct of certain businesses, which was not in any way covered by the 1878 Act. Hence it is plain to me that neither the Eckloff nor the Hutton decision gives support to the ruling below.

There is nothing in the Organic Act which can be held to directly affect or conflict with the Acts before us. The express words of the first section of the Organic Act are that "all laws now in force relating to the District of Columbia not inconsistent with the provisions of this Act shall remain in full force and effect." While the 1878 Act reorganized the form of the District Government and the administration thereof, it did not by implication or otherwise repeal, supersede or supplant the whole body of pre-existing law governing the District.

Was there any later legislation working a repeal of the Acts here involved? The trial court relied on the Licensing Act of July 1, 1902, 32 Stat. 622, and 27 Stat. 394 and 47 Stat. 550 as such legislation. Those statutes dealt primarily with the Commissioners' right to issue and revoke licenses of certain public places of amusement. It would be wrong to say that such statutes, dealing primarily with licensing, worked a repeal of former regulatory Acts.

We have been cited to no other later statute which is so expressly repugnant to the Acts in question as to require a ruling that it superseded them. In the absence of any such statute and in view of the many judicial determinations after the Organic Act holding Acts of the Legislative Assembly valid, the trial judge was in error in this ruling. Cooper v. District of Columbia, MacArthur & Mackey, 1880, 11 D.C. 250; District of Columbia v. Waggaman, 1885, 4 Mackey 328, 15 D.C. 328; District of Columbia v. Burgdorf, 1895, 6 App.D.C. 465; District of Columbia v. Weaver, 1895, 6 App.D.C. 482; Parsons v. District of Columbia, 1896, 8 App.D.C. 391; Lasley v. District of Columbia, 1899, 14 App.D.C. 407; Johnson v. District of Columbia, 1908, 30 App.D.C. 520.

The next question is whether the Act of Congress establishing a Code of law for the District of Columbia, 31 Stat. 1189, had any effect on the validity of the Acts. The language in section 1636 provides that all Acts of the General Assembly of the State of Maryland, all Acts and parts of Acts of the Legislative Assembly of the District of Columbia, and all Acts of Congress applying to the District of Columbia shall be repealed *with certain specific exceptions*. The most pertinent exceptions are set forth in Section 1636 and Section 1640. Under the first section, specifically excepted from repeal are "police regulations, *and generally all acts and parts of acts relating to municipal affairs only * * *.*" (Emphasis supplied.) Section 1640 reads: "Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia of the common law * * * or of any municipal ordinance or regulation, except in so far as the same may be inconsistent with, or is replaced by, some provision of this code." The Acts in question being merely regulatory in nature it follows that by the plain terms of this section, the repealing clause had no effect on the Acts and that they were intended to and did remain in force.

The next argument deals with the 1872 and 1873 Acts in the light of several Code provisions, and of regulations promulgated much later by the Commissioners. Appellee argues that there is conflict between the 1872 and 1873 Acts, and other valid Acts in this jurisdiction and that the former Acts have been impliedly repealed by the later ones. Examining the general licensing laws, 32 Stat. 622, 47 Stat. 550, et seq., which are in effect in the District of Columbia, Code Sections 47–2301, 47–2327, 47–2345, I find, as already noted, that there is nothing in these statutes which is inconsistent with the Acts in question. The 1872 and 1873 Acts do not treat the matter of *issuance* of licenses, but only concern the revocation of a license when there has been a violation. There is no

reason why the two laws cannot exist side by side without conflict. United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181. See also Richards v. Davison, 45 App.D.C. 395, citing District of Columbia v. Lee, 35 App.D.C. 341; U. S. ex rel. Early v. Richards, 35 App.D.C. 540. Nor are the Acts in question in any way inconsistent with other current restaurant and building regulations: all should be considered as cumulatively binding. Certainly the fact that the Commissioners have from time to time promulgated additional regulations in no way affects a valid prior regulation. These regulations supplemented existing laws; they did not supersede them.

Appellee says that the Alcoholic Beverage Control Act of 1934, Code 1940, § 25-101 et seq., superseded these Acts. Particular emphasis is placed on Section 25–121 which, among other things, prohibits sale of intoxicants to persons below certain age levels. The 1872 and 1873 Acts deal with an over-all regulation of various services (restaurants for example); the ABC Act merely places further restrictive regulations upon sales of liquor—which has traditionally been the subject of separate regulation. Both in their own way regulate a different aspect of public health, safety and order. They exist and operate concurrently. For practical purposes the later Act may be regarded as "merely affirmative, or cumulative, or auxiliary." Wood v. United States, 16 Pet. 342, 10 L.Ed. 987.

The argument is also made that even if the Acts were valid in their inception they are no longer valid because they have become obsolete and have not been enforced in this jurisdiction. The point is not well taken. A failure to enforce the law does not and cannot change it. See Louisville & N. R. Co. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672; Standard Oil Co. v. Fitzgerald, 6 Cir., 86 F.2d 799, certiorari denied 300 U.S. 683, 57 S.Ct. 753, 81 L.Ed. 886; Chicago B. & Q. R. R. Co. v. Iowa, 94 U.S. 155, 24 L.Ed. 94; Kelly v. State of Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3. See also Costello v. Palmer, 20 App.D.C. 210. Otherwise administrative officials could through inaction repudiate or work a repeal of any validly enacted legislation.

■ As will appear, Judge Hood is of the opinion that the Acts of 1872 and 1873 were invalid when acted, and Judge Clagett is of the opinion that the Act of 1872 was repealed by the Act of 1873. Thus a majority of the court rules that the Act of 1872 has no operative effect and (since the first count was based on that Act) no prosecution can be maintained thereon. Consequently the order of the Municipal Court quashing the first count of the information will be affirmed.

But Judge Clagett and I agree that the Act of 1873 was valid when enacted and has not been repealed. Accordingly, it is the decision of this court that the order quashing the second, third and fourth counts of the information must be reversed.

Affirmed as to Count One of the Information. Reversed as to Counts Two, Three and Four.

CLAGETT, Associate Judge.

I have concluded that the 1872 act was repealed by the 1873 act, and that the latter was valid when enacted and has not been repealed. As to the validity of the 1873 act particularly I disagree with much of the opinion of Chief Judge Cayton and therefore state my own opinion separately.

The resurrection after eighty years of statutes which appear in none of the modern codes or compilations of statutes relating to the District of Columbia requires explanation and something of historical background. This history began with the submission to the states of Art. 1, sec. 8, cl. 17 of the Federal Constitution providing that: "The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government * * *."

In No. XLIII of the Federalist, James Madison gave the following contemporaneous explanation of the constitutional clause just quoted: "The indispensable necessity

of complete authority at the seat of government, carries its own evidence with it. It is a power exercised by every Legislature of the Union, I might say of the world, by virtue of general supremacy. Without it, not only the public authority might be insulted and its proceedings interrupted with impunity; but a dependence of the members of the general government on the State comprehending the seat of the government, for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight, as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession, will be derived from the whole people of the State, in their adoption of the Constitution, every imaginable objection seems to be obviated."

Provision for the District government was first made February 27, 1801, 2 Stat. 103, Code 1940, Historical, p. XXXIII. After the recession of the Virginia portion of the District, there remained in it as separate entities what became the City of Washington and also the City of George-

town, as well as the outlying territory not included in either. By an act of Congress approved May 3, 1802, 2 Stat. 195, Code 1940, Historical, p. XXXIV, the City of Washington was first incorporated, with a mayor appointed by the President, and a city council of two houses to be elected annually.

By an act approved May 15, 1820, 3 Stat. 583, Code 1940, Historical, p. XXXIX, Congress passed a new act for the incorporation of the City of Washington, repealing all acts theretofore passed for that purpose, creating a mayor and city council, providing for voting qualifications and enumerating various powers, including the power "to provide for licensing, taxing, and regulation, auctions, retailers, ordinaries, and taverns, hackney carriages, wagons, carts, and drays, pawn-brokers, venders of lottery tickets, money-changers, and hawkers and pedlars; to provide for licensing, taxing, regulating, or restraining, theatrical or public shows and amusements; to restrain or prohibit tippling houses, lotteries, and all kinds of gaming; to regulate and establish markets; * * * to provide for the establishment and superintendence of public schools".

By an act of Congress approved May 17, 1848, 9 Stat. 223, Code 1940, Historical, p. XLIII, the charter of Washington was amended by enumerating a long list of designated powers, including the power to "provide for licensing, taxing and regulating livery stables, and wholesale and retail dealers * * *." As to the territory within the District, but outside of Washington and Georgetown, Congress by the act of March 3, 1863, 12 Stat. 799, Code 1940, Historical, p. XLVIII, empowered the "Levy Court" to grant licenses to wholesale and retail dealers in goods, wares or merchandise "under such restrictions and penalties as the said levy court may deem expedient."

Eliminating discussion of intervening statutes of no immediate relevancy, we come now to the significant act of Congress approved February 21, 1871, 16 Stat. 419, Code 1940, Historical, p. LI et seq., establishing for the first time a government for the entire District of Columbia. This act

provided for a governor to be appointed by the President, a bicameral legislative assembly consisting of a council and house of delegates, a board of public works, and a non-voting delegate to the national Congress. Section 18 of the act provided: *"And be it further enacted,* That the legislative power of the District shall extend to all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act, subject, nevertheless, to all the restrictions and limitations imposed upon States by the tenth section of the first article of the Constitution of the United States; but all acts of the legislative assembly shall at all times be subject to repeal or modification by the Congress of the United States, and nothing herein shall be construed to deprive Congress of the power of legislation over said District in as ample manner as if this law had not been enacted."

This fundamental law was thoroughly discussed in Congress before its adoption.[1] Summing up the constitutional status of the District of Columbia, it has been said that the District is a separate political community in a certain sense and in that sense may be called a state whose sovereign power is lodged in the Government of the United States; but it is not strictly a state within the meaning of that term as used in the Constitution.[2] It must be kept constantly in mind that at the time of the creation of the District of Columbia as an entity separate from the states it included more than one municipality. In that sense, at least, it was like a state whose legislature enacts laws for the entire state, delegating to various municipalities the power to pass ordinances affecting only the inhabitants of those particular municipalities.

It is against this constitutional and legislative background that there must be considered the two acts of the legislative assembly invoked in the present case.[3] Section 1 of the first act, that of June 20, 1872, provided that keepers or owners of restaurants and of certain other establishments were required to post a scale of prices for which the different articles kept for sale would be furnished.[4] Section 3 of that act provided: *"And be it further enacted,* That any restaurant keeper or proprietor, any hotel keeper or proprietor, proprietors or keepers of ice-cream saloons or places where soda-water is kept for sale, or keepers of barber shops and bathing houses, refusing to sell or wait upon any respectable well-behaved person, without regard to race, color, or previous condition of servitude, or any restaurant, hotel, ice-cream saloon or soda fountain, barber shop or bathing-house keepers, or proprietors, who refuse under any pretext to serve any well-behaved, respectable person, in the same room, and at the same prices as

1. See Cong. Globe, 41st Cong., 3rd Sess., pp. 643–644 (1871). The Star and the Daily National Republican were also published but were not official publications.

2. Metropolitan R. Co. v. District of Columbia, 132 U.S. 1, 10 S.Ct. 19, 33 L. Ed. 231; District of Columbia v. Tyrrell, 41 App.D.C. 463.

3. These acts are printed in "Laws of District of Columbia," published by the Chronicle Publishing Company. In the preface of this publication signed by Edwin L. Stanton, Secretary of the District of Columbia, there appears the following: "In its preparation copies of the Acts of Congress, furnished and certified by the Department of State, have been used; and as to the Acts of the Legislative Assembly, the edition has been carefully collated and compared with the original rolls in the archives of the District." The acts of the legislative assembly referred to were passed by both houses of the legislative assembly and signed by the governor. These acts were thoroughly debated and such debates were duly reported in the newspapers of the day. Some of the briefs filed herein adopt misleading citations for the acts by referring to Abert and Lovejoy's Compilation of 1894. However this compilation was wholly unofficial and never received official sanction.

4. The agreed statement of facts discloses that the records of the District of Columbia fail to show that any local restaurant or eating house ever complied with this provision or that any demand for such price list was ever made. The same applies to the 1873 act. The local officials simply failed to enforce the law.

other well-behaved and respectable persons are served, shall be deemed guilty of a misdemeanor, and upon conviction in a court having jurisdiction, shall be fined one hundred dollars, and shall forfeit his or her license as keeper or owner of a restaurant, hotel, ice-cream saloon, or soda fountain, as the case may be, and it shall not be lawful for the [Register] or any officer of the District of Columbia to issue a license to any person or persons, or to their agent or agents, who shall have forfeited their license under the provisions of this act, until a period of one year shall have elapsed after such forfeiture."

The act of June 26, 1873, was more detailed. Section 1 provided for the posting of the common or usual prices to be charged. Section 2 provided that lists of such price or prices must be transmitted to the Register of the District. Failure to transmit such copies to the Register was punishable by fine and forfeiture of the license. Section 3 provided as follows: "And be it further enacted, That the pro-

prietor or proprietors, keeper or keepers, of any licensed restaurant, eating-house, bar-room, sample-room, ice-cream saloon, or soda-fountain room shall sell at and for the usual or common prices charged by him, her, or them, as contained in said printed cards or papers, any article or thing kept for sale by him, her, or them to any well-behaved and respectable person or persons who may desire the same, or any part or parts thereof, and serve the same to such person or persons in the same room or rooms in which any other well-behaved person or persons may be served or allowed to eat or drink in said place or establishment: * * *."

The penalty provision was set forth in Section 4 which imposed a $100 fine and a forfeiture of the license for one year.

There were several prosecutions for violation of the 1872 act, but no prosecutions under the act of 1873.[5]

The legislative assembly was abolished by the Temporary Organic Act of June 20,

5. An agreed statement of facts signed by respective counsel, the contents of which are repeated in the briefs, recites that "There is no official record of any attempted prosecutions for violations of the terms of the legislative assembly act of June 20, 1872." It is further recited on information and belief, however, that there were four such prosecutions. Although not particularly important, these "facts" are incorrect. The records of the Supreme Court of the District of Columbia (now the United States District Court of the District of Columbia) show that actually there were five such prosecutions. In No. 9420, District of Columbia v. Sebastian Aman, filed September 17, 1872, Aman, a Ninth Street proprietor, was accused of refusing to sell whiskey to a person of color. In the Police Court he was found guilty and fined $100 and his license ordered forfeited. On appeal to the D. C. Supreme Court, December 6, 1872 (under a trial de novo) a jury was sworn and he was found not guilty. In No. 9451, District of Columbia v. Henry Scherf, filed October 11, 1872, defendant was found guilty in Police Court and fined $30. On appeal to the D. C. Supreme Court, December 6, 1872, a nolle prosequi was presented by the District Attorney. In No. 9452, District of

Columbia v. Henry Scherf, filed October 11, 1872, Scherf, a Pennsylvania Avenue proprietor, was accused of refusing to sell liquor to a person of color on July 29, 1872. In Police Court he was found guilty and fined $100 and ordered to forfeit his license. On appeal to the D. C. Supreme Court he was found not guilty by a jury. In No. 9453, District of Columbia v. Gottlieb Shoible, filed October 11, 1872, defendant, operating a restaurant at 7th and E Streets, was accused of refusing to sell beer because of color. In Police Court defendant was found guilty and fined $100 and his license ordered forfeited. On appeal to the D. C. Supreme Court, December 5, 1872, on motion the information was quashed. In No. 9474, District of Columbia v. Fred Freund, filed November 25, 1872, defendant, proprietor of a restaurant at Pennsylvania Avenue and 11th Street, was accused of refusing to sell and wait on four colored persons in answer to a request for ice cream and cake to be eaten on the premises. In Police Court defendant was found guilty and fined $100 and his license ordered forfeited. On appeal to D. C. Supreme Court, December 5, 1872, a nolle prosequi was presented by the District Attorney. These cases were fully reported in the Evening Star and the Daily Na-

1874, 18 Stat. 116, Code 1940, Historical, p. LVI et seq., which provided for an interim form of commission government for the District of Columbia with separate school and police boards. No acts of the legislative assembly, however, were repealed. By the present Organic Act of June 11, 1878, 20 Stat. 102, Code 1940, Historical, p. LVIII et seq., a permanent form of government for the District was established. The enacting clause of this statute provided: "Said District and the property and persons that may be therein shall be subject to the following provisions for the government of the same, and also to any existing laws applicable thereto not hereby repealed or inconsistent with the provisions of this act. * * * and all laws now in force relating to the District of Columbia not inconsistent with the provisions of this act shall remain in full force and effect." This act neither created new laws or regulations for the District nor repealed old ones except laws relating to the organization of the District. Instead it provided for the drafting of such additional laws and changes in old ones as might be subsequently reported to Congress.

Congress in 1901 passed a new Code of Laws for the District of Columbia, 31 Stat. 1189. Section 1 provided that: "The common law, all British statutes in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force at the date of the passage of this act shall remain in force except in so far as the same are inconsistent with, or are replaced by, some provision of this code." Section 1636 of the 1901 Code provided that: "All acts and parts of acts of the general assembly of the State of Mary-

land general and permanent in their nature, all like acts and parts of acts of the legislative assembly of the District of Columbia, and all like acts and parts of acts of Congress applying solely to the District of Columbia in force in said District on the day of the passage of this act are hereby repealed, except: * * *." There followed eleven exceptions (not repealed) only three of which appear relevant to the present question, namely: "Third. Acts and parts of acts relating to the organization of the District government, * * * or to police regulations, and generally all acts and parts of acts, relating to municipal affairs only, including those regulating the charges of public-service corporations" and "Fifth. All penal statutes authorizing punishment by fine only or by imprisonment not exceeding one year, or both." The 1901 Code was the last which was enacted by Congress. Two other codes were compiled, one in 1929, and one in 1940, but neither received the official approval of Congress. Neither the 1901 (official) nor the 1929 or 1940 (unofficial) codes included either of the acts of the legislative assembly here discussed.

## I.

### The Validity of the Acts of the Legislative Assembly.

The chief argument against the validity of these acts is that Congress under the Constitution could delegate to the legislative assembly, or any other government for the District of Columbia, only the power to make "municipal" and "police" regulations and could not delegate to any local government the power to enact "general" legislation. This statement of the law is supported by every extant authority.[6]

We must determine, then, whether the acts in question were "police regulations." The argument is made that they were police regulations because they were passed under the police power. Police power is

tional Republican of December 4, 5, 6, and 7, 1872. These reports show that the validity of the act was not passed upon.

6. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Roach v. Van

Riswick, MacArthur & M., 11 D.C. 171; Smith v. Olcott, 19 App.D.C. 61; United States v. Cella, 37 App.D.C. 433; Johnson v. District of Columbia, 30 App.D.C. 520; United States ex rel. Daly v. MacFarland, 28 App.D.C. 552.

the inherent right of a nation or state or city to regulate the health, safety, comfort, or welfare of its citizens. It would be a waste of time to accumulate definitions. In its final analysis it has been defined as the power to govern.[7]

Laws and ordinances relating to the comfort, health, and good government of the inhabitants of a city are ordinarily described as "police regulations," and, though they may disturb the full enjoyment of a personal right, they are constitutional, notwithstanding they do not provide compensation therefor, for they do not appropriate private property for public use but merely regulate the enjoyment by the owner, who is supposed to be compensated by sharing in the benefits which such regulations are intended to secure.[8]

While all police regulations must be justified under the police power, it does not follow that all measures supported by the police power are deemed police regulations. In other words, police regulations and the police power are not the same. It is merely a play on words to say they are. There is a difference, but there is no accepted outline of the scope of the two terms.

In the states the answer is not too difficult. It is largely a matter of territorial extent. A question affecting the people of the entire state is left to the state legislature; a question which concerns only the people of different communities is left to the cities. The problem is complicated here by the fact that the legislative assembly legislated for the entire District just as a state legislature does.

It is argued here that the distinction between general legislation and municipal regulations or police regulations is that the first affects *rights* while the other does not.

It is also said these acts were not police regulations because they affected "policy" or the mores of the community. It is conceded (as I think it must be conceded) that Congress itself could have passed these acts, but that since they gave Negroes new *rights,* it is urged they were beyond the local power of the legislative assembly.

I have no doubt that the acts did confer new rights not created by the Thirteenth, Fourteenth, and Fifteenth Amendments or by any legislation enacted by Congress pursuant to those amendments.[9] I think it merely begs the question to claim that they did not.

■ But I have concluded that the acts, conferring new rights as they did, were constitutional and valid. I so conclude because it is axiomatic that an act of a legislature is presumed to be constitutional,[10] and I have heard no argument which overcomes this presumption. I think the true rule as to what acts the legislative assembly of the District of Columbia could not pass is that it could not pass acts regulating interstate commerce,[11] or regulating the processes of the United States courts,[12] or affecting the national or general interest in some other respect. True, other tests have been mentioned, but I do not think they are supportable. We have been cited to no case, and I know of none that holds that the creation of new rights or a new policy is the mark of "general legislation." On the other hand, local option liquor laws, for example, have long been upheld as within the power of municipalities. Could any legislation affect policy more or more directly change the mores of a community?

Acts of the legislative assembly have been upheld which exempted from D.C. taxation local property used for manufacturing pur-

7. See Slaughter-House Cases (Butchers' Benev. Ass'n v. Crescent City Livestock Landing & Slaughter-House Co.), 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394; Stone v. Mississippi, 101 U.S. 814, 25 L. Ed. 1079.

8. Atlantic City v. France, 75 N.J.L. 910, 70 A. 163, 18 L.R.A.,N.S., 156.

9. The Civil Rights Cases (U. S. v. Stanley), 109 U.S. 3, 3 S.Ct. 18; 27 L.Ed. 835.

10. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138.

11. Stoutenburgh v. Hennick; 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637.

12. Roach v. Van Riswick, MacArthur & M., 11 D.C. 171.

poses[13] and prohibiting cruelty to animals, to mention only two of the most notable cases.[14] Certainly the first of those acts created rights and established a policy.

I have concluded that the true test of what is a police regulation in the municipal sense is not whether it creates a right or changes the mores of a community or establishes a policy. All regulations and legislative acts do these things in greater or less degree.

The true test, I believe, is whether the act or regulation is really local. The whole theory of our constitutional form of government is that local matters should be governed by local people. Closely examined, the other tests really come down to this one.

And judged by this test I am forced to the conclusion that these acts were truly municipal. They would, of course, affect visitors to the city, but the same is true of all important police regulations. They affected no national interest; they did not interfere with interstate commerce; they interfered with no rights of the states; they were local in every sense of the word. Granted, as has been thoroughly established, that a state may pass such legislation, I think it follows that, when authorized by Congress to do so, the local legislature had the same power.

I have concluded that the power which *can* be delegated by Congress to a District government is broad enough to include these acts, that the necessary power *was* delegated and therefore that the acts were constitutional when passed.

## II.

### Are the Acts Discriminatory?

It is argued that the acts were un-reasonable and arbitrary in that they undertook to set up and apply unreasonable and arbitrary classifications and distinctions. But I do not believe that appellee can complain because *all* businesses were not included. At the present time, at least, all races are served in most business establishments in the District. I do not believe the acts are open to attack on this ground.[15]

## III.

### Did the 1873 Act Repeal the 1872 Act?

The first count of the information was based upon the 1872 act and the second, third, and fourth counts were based upon the act of June 26, 1873. Appellee urged that the first act was repealed by the second. As already recited, the 1873 act provided that "all acts and parts of acts inconsistent herewith are hereby repealed." While generally similar, the two acts differ in material respects. The penalties for failing to post prices are different and conflicting. The 1873 act makes no reference to barber shops or bathing houses as did the 1872 act. Moreover the 1873 act required service to "any respectable well-behaved person" whereas the 1872 act referred to race, color, or other condition of servitude, one of the provisions which had caused difficulty in the courts. It might be possible to mesh the two acts together, but the effort would be difficult. Moreover it is clear that efforts to enforce the 1872 act had failed.[16] The 1873 act was much more detailed. It referred only to "licensed" establishments, whereas the 1872 act was ambiguous in this respect. It seems clear that the effect of the 1873 act was to repeal the 1872 act, at least so far as restaurants are concerned. It follows that, in my opinion, the first count of the information must stand quashed.

13. Welch v. Cook, 7 Otto 541, 24 L.Ed. 1112.

14. Johnson v. District of Columbia, 30 App.D.C. 520.

15. Zahn v. Board of Public Works, 274 U. S. 325, 47 S.Ct. 594, 71 L.Ed. 1074, and cases cited therein.

16. The Evening Star indicated that the 1873 bill was introduced to correct the deficiencies of the earlier act, saying:

"Mr. Brooks (who introduced C 61) said he regretted the necessity of such a law but it had come to his knowledge that it was highly necessary, in consequence of the law passed at the last session of the legislature being defective, and consequently inoperative." The bill was passed by the lower house, representing the wards of the city, by a vote of 17 to 1.

## IV.

### *Has the 1873 Act Been Repealed?*

Two congressional enactments are relied on chiefly as repealing, expressly or by implication, the 1872 and 1873 acts of the legislative assembly. (As a matter of convenience, both acts are referred to.) These are the Organic Act of June 11, 1878, 20 Stat. 102, establishing a permanent form of government for the District, and the 1901 Code of Laws for the District, 31 Stat. 1189, Act of March 3, 1901. The trial court held that the legislation was repealed by implication by the Organic Act of 1878. I find no sound basis for this conclusion. Certainly the 1878 act did not repeal these acts directly; it only repealed "all laws * * * inconsistent with the provisions of this act"; and I find nothing inconsistent in the new enactment with the old ones. Neither can I find anything in subsequent licensing acts or regulations to repeal the 1872 and 1873 acts.

The next question is whether the acts were repealed by the 1901 Code. Section 1 of the 1901 Code provided: "The common law, all British statutes in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force at the date of the passage of this act shall remain in force except in so far as the same are inconsistent with, or are replaced by, some provision of this code."

It is clear, therefore, that these acts of the legislative assembly were not specifically continued in force. But were they repealed?

Section 1636 provided: "All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature, all like acts and parts of acts of the legislative assembly of the District of Columbia, and all like acts and parts of acts of Congress applying solely to the District of Columbia in force in said District on the day of the passage of this act are hereby repealed, except:"

There follow nine groups of exceptions, of which only the third and fifth are pertinent. The third exception provides: "Third. Acts and parts of acts relating to the organization of the District government, or to its obligations, or the powers or duties of the Commissioners of the District of Columbia, or their subordinates or employees, *or to police regulations, and generally all acts and parts of acts relating to municipal affairs only including those regulating the charges of public-service corporations.*" (Emphasis supplied.)

The fifth exception provides: "Fifth. All penal statutes authorizing punishment by fine only or by imprisonment not exceeding one year, or both."

Section 1636 concludes: "All acts and parts of acts included in the foregoing exceptions, or any of them, shall remain in force except in so far as the same are inconsistent with or are replaced by the provisions of this code."

Section 1640 does not establish further standards but acts as a "reassurance" provision in that it restates those laws already specified in Section 1 which shall remain in force. It reads: "Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia of the common law or of any British statute in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, or of the principles of equity or admiralty, or of any general statute of the United States not locally inapplicable in the District of Columbia or by its terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, or of any municipal ordinance or regulation, except in so far as the same may be inconsistent with, or is replaced by, some provision of this code."

In other words, the act repealed all acts of the legislative assembly "general and permanent in their nature" except "police regulations" and acts "relating to municipal affairs only". Therefore if these

264

acts of the legislative assembly were more than police regulations, then the assembly had no power to enact them. If they were police regulations or acts relating to municipal affairs, then they were not repealed by the 1901 Code.

■ ■Having in mind the background of the acts, I have reached the conclusion that they were not repealed by the 1901 Code nor by any other act of Congress. Congress has always had the power to repeal these acts of the legislative assembly. I conclude, however, that it has not done so.

In the old case of Roach v. Van Riswick, MacArthur & M., 11 D.C. 171, 172, 173, decided by the general term of the District Supreme Court, occurs a discussion which may indicate the real reason why several of the acts of the legislative assembly have been declared unconstitutional. The court said: "There has been an instinctive reluctance on the part of bench and bar, to recognize the legislation of the late government of the District as valid, so far as it transcended the limits of strictly municipal action. This sentiment has hardly shaped itself into a definite opinion or formulated the reasons for its existence. It has sometimes sought its excuse in the want of positive confirmation by Congress of the legislation in question. This, however, is a very unsatisfactory foundation for it. The organic act, as it is called, i. e., the act of February 21, 1871, which establishes the District government, nowhere contains an intimation that the acts of the new government are to be inoperative until or unless confirmed by Congress; but, on the contrary, by the strongest implication, excludes such idea. The 50th section declares that all acts of the legislative assembly shall at all times be subject to *repeal* or *modification* by the Congress of the United States. Until repealed or modified, the clear implication is that they are to operate, *proprio vigore*. If Congress had first to approve, it is obvious that its judgment as to the rightfulness or expedience of measures submitted to them would be exercised then, and it was unnecessary to reserve it expressly, or the occasion when legislation once in force, is to be reviewed in order to modify or annul it. It is plain to us that as far as Congress could confer the power of original and independent legislation, needing no confirmation, but complete and operative in itself, it has done so by the act in question. The unwillingness so generally felt to give effect to this legislation grows partly out of a lurking doubt which existed from the beginning and has never been dispelled, as to the constitutional power of Congress to create such an anomalous entity as the late District government, and to invest it with the powers which the act of 1871 purports to convey."

But Congress *did* create such a body. It later decided it had made a mistake. It soon abolished the "anomalous entity" it had created. It still has the unquestioned power to repeal this act. Until and unless Congress acts specifically, I believe the 1873 act of the legislative assembly must stand.

I would reverse the judgment of the trial court except as to the first count of the information.

HOOD, Associate Judge (dissenting).

In 1879 the Supreme Court of the District of Columbia held invalid an act of the legislative assembly on the ground that it "was an act of legislation which it was only competent for the Congress of the United States to pass." Roach v. Van Riswick, MacArthur & Mackey, 11 D.C. 171, 187. In the following year the same court, construing its previous opinion, said: "All that was decided there was that Congress had no right to bestow upon the legislative assembly of the District any powers which were not necessary for it *as a municipality*." Cooper v. The District of Columbia, MacArthur & Mackey, 11 D.C. 250, 251. In 1889 the Supreme Court of the United States, holding an act of the legislative assembly invalid, said: "But, as the repository of the legislative power of the United States, congress, in creating the District of Columbia 'a body corporate for municipal purposes,' could only authorize it to exercise municipal powers, and this is all that congress attempted to do." Stoutenburgh v. Hennick, 129 U.S. 141,

147, 9 S.Ct. 256, 257, 32 L.Ed. 637. In 1901 the Court of Appeals of the District of Columbia, holding an act of the legislative assembly invalid, said: "It is not a mere local regulation within the scope of the powers ordinarily delegated to muncipal corporations, but an attempt at the exercise of a general legislative power over the freedom of contracts." Smith v. Olcott, 19 App.D.C. 61, 75. In 1905 the Court of Appeals, in referring to the powers of the Commissioners of the District, said: "Congress has reserved to itself, not only the power of legislation in the strict sense of the term, which it cannot constitutionally delegate to anyone or to any body of men, but even the power of enacting municipal ordinances, such as are within the ordinary scope of the authority of incorporated municipalities." Coughlin v. District of Columbia, 25 App.D.C. 251, 254. In 1908, upholding an act of the legislative assembly, the Court of Appeals, citing the Stoutenburgh case, said: "We think it clear that the two sections of the act above referred to, which, it will be observed, are complete in themselves, are mere police regulation, and therefore within the scope of powers delegated to the municipality by Congress." Johnson v. District of Columbia, 30 App.D.C. 520, 522.

In the face of these expressions of the highest courts of this jurisdiction, stated over a period of many years, I think we must hold that the legislative power of the legislative assembly was limited to the passage of police regulations and municipal ordinances, and I understand my colleagues, as well as counsel for the District, to agree, at least to some extent, with this conclusion.

While the distinction between general legislation and police or municipal regulation is not always clear,[1] it seems rather obvious to me that the legislation here in question was civil rights legislation, rising to a higher plane or dignity than mere regulation of restaurants and other places of public entertainment. The many cases, both federal and state, dealing with civil rights legislation, make it plain that such legislation concerns itself with rights rather than regulation, although such rights may be guaranteed or enforced through regulation.[2]

Certain briefs filed with us assert that legislation of this type has been commonly enacted by municipalities, but no case is cited upholding the enactment of civil rights legislation by municipal ordinance. In the only case I have found where a municipality attempted to pass such a regulation, it was held to be beyond the power of the city. Nance v. Mayflower Tavern, Inc., 106 Utah 517, 150 P.2d 773.

If, as I read the cases, the legislative assembly was limited in its legislative power to the enactment of police and municipal regulations, and if, as I believe, the enactments in question cannot be properly classified as such, then it follows that such enactments were ineffective. Reaching this conclusion, I find it unnecessary to discuss other points raised in the case.

1. United States v. Cella, 37 App.D.C. 433, certiorari denied, 223 U.S. 728, 32 S.Ct. 526, 56 L.Ed. 633.

2. E. g., The Civil Rights Cases (U. S. v. Stanley), 109 U.S. 3, 3 S.Ct. 18, 27 L. Ed. 835; People v. King, 110 N.Y. 418, 18 N.E. 245, 1 L.R.A. 293; Rhone v. Loomis, 74 Minn. 200, 77 N.W. 31; Piluso v. Spencer, 36 Cal.App. 416, 172 P. 412; Anderson v. Pantages Theatre Co., 114 Wash. 24, 194 P. 813; Bob-Lo Excursion Co. v. People of State of Michigan, 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455.